Argued January 12, reversed February 3, rehearing denied June 30, 1914.

# BABER *v.* CAPLES.*

(138 Pac. 472.)

**Gifts—Causa Mortis—Evidence—Weight and Sufficiency.**

1. Evidence *held* to show that decedent gave the promissory notes in controversy to defendant; that she indorsed each of them with her own hand, and delivered them to the defendant with intent to vest title in him, and that he accepted them as a gift *causa mortis.*

[As to conveyances regarded as gifts *causa mortis*, see notes in 99 Am. St. Rep. 890; Ann. Cas. 1912C, 272.]

**Gifts—Causa Mortis—Delivery—"Gift Causa Mortis."**

2. A "gift *causa mortis*," like a gift *inter vivos*, must be completely executed and go into immediate effect, and be accompanied by an actual and complete delivery.

[As to delivery sufficient to support a gift *causa mortis*, see notes in 50 Am. Rep. 178; Ann. Cas. 1914A, 529.]

**Gifts—Causa Mortis—Delivery—Chose in Action.**

3. Whether a gift of a promissory note or other chose in action is *causa mortis* or *inter vivos*, the actual delivery of the written evidence of the debt is sufficient, without any assignment or indorsement.

[As to gift *causa mortis* of notes and other choses in action payable to order, see notes in 23 Am. Dec. 600; 25 Am. Dec. 389.]

**Gifts—Causa Mortis—Validity.**

4. Gifts *causa mortis*, if made by competent persons, and fully executed, are valid, in the absence of fraud or undue influence, if the rights of creditors are not affected.

**Gifts—Causa Mortis—Evidence.**

5. While gifts *causa mortis* are sustained only on clear proof of the essential facts, there is no presumption of law against them.

**Evidence—Expert Testimony—Weight and Effect.**

6. Opinion evidence in relation to handwriting is generally viewed with caution by the courts.

**Gifts—Causa Mortis—Burden of Proof.**

7. Where a relation of confidence exists, as between a man and woman engaged to be married, it is incumbent upon the donee *causa mortis* to show that the gift was not obtained by fraud or undue influence.

**Cancellation of Instruments—Suit to Set Aside Gift—Laches.**

8. Where plaintiffs' in a suit to set aside a gift *causa mortis*, knew as much about the facts 12 years before as when suit was commenced, their acquiescence in the gift for that time was laches.

---

*On the question of gift of promissory note *causa mortis*, see note in 26 L. R. A. 305. And as to gifts *causa mortis*, generally, see note in 27 L. Ed. 500.                                    REPORTER.

Gifts—Causa Mortis—Evidence—Weight and Sufficiency.
  9.  Evidence *held* to show that a gift *causa mortis* was not induced by fraud or undue influence of the donee.

From Multnomah: HENRY E. McGINN, Judge.

Department 1.  Statement by MR. JUSTICE RAMSEY.

This is a suit in equity by Minnie Baber and Josephine Baber MacLeod against C. C. Caples, to set aside a gift *causa mortis,* for an accounting, etc.  In the court below there was a decree for the plaintiffs and defendant appeals.  The facts appear in the opinion of the court.          REVERSED AND SUIT DISMISSED.

For appellant there was a brief over the names of *Mr. John T. McKee* and *Messrs. Cake & Cake,* with oral arguments by *Mr. William M. Cake* and *Mr. McKee.*

For respondents there was a brief over the names of ·*Mr. Manche I. Langley* and *Messrs. King & Saxton,* with oral arguments by *Mr. Will R. King* and *Mr. Langley.*

MR. JUSTICE RAMSEY delivered the opinion of the court.

On July 3, 1912, the plaintiffs began this suit to set aside a gift *causa mortis* made by Liverne H. Baber, to the defendant, in March, 1900, and for an accounting, etc.

The complaint is lengthy, and, as no questions arise as to its sufficiency, it is unnecessary to set it forth in this opinion.

Granville H. Baber, the father of Liverne H. Baber and the plaintiff Josephine Baber MacLeod, and husband of the plaintiff Minnie Baber, died testate in Washington County on August 1, 1898, leaving an

estate of the value of $33,000. Said Liverne H. and Josephine were his sole heirs, and Minnie Baber, his widow. At the time of his death Josephine was 12 years old and Liverne was about 22. The decedent in his will appointed the defendant executor thereof, and trustee. The will was admitted to probate by the County Court of Washington County, and letters testamentary were duly issued to the defendant. By the terms of said will the defendant, as executor, was directed to pay to Liverne a legacy of $5,000 upon the death of the testator, or as soon thereafter as he could collect the same out of the assets of the estate, and she was given also one third of the residue of the estate when she should reach the age of 23 years. The defendant paid said sums to Liverne in accordance with the terms of the will, and took her receipts therefor. The last payment amounted to $6,203.25 in money, notes, mortgages, and land, and was made in November, 1899. The defendant resigned the trusteeship of said estate, created by said will, before this suit was commenced. A few weeks after the death of Granville H. Baber, the defendant and Liverne became engaged to be married, and this engagement continued until the death of Liverne. She died on March 22, 1900, intestate. Prior to the death of her father, the defendant "went with" her, but there was no engagement until shortly after his death. This engagement was known to the plaintiffs prior to the death of Liverne. Liverne went to Stanford University in December, 1898 (after her father's death, and after the engagement to the defendant), and remained there as a student until the close of the college year in May, 1899, and then she went to Pacific Grove for awhile. She returned home in the summer of 1899, and resided at home with her mother, at Forest Grove, until her

death on March 22, 1900. She died of consumption, but she was not known to be dangerously ill until a short time before her death. She was not a robust person, but no one knew that she had consumption until a short time before her decease.

The complaint alleges, in substance, that the defendant, at the time of the death of Liverne, had possession of about $8,000 in notes belonging to her, and falsely and fraudulently represented to the plaintiffs that Liverne had given him said notes, and it alleges, also, as a separate cause of suit, that the defendant induced Liverne, by fraud and undue influence, to give him said notes. These matters were put in issue by the answer. The defendant asserts that Liverne told him several times before her death that she was likely to die soon, and asked him to have someone prepare for her a will, giving all of her property to him, and saying that she wanted to give all of her property to him. He testified that he told her that she was not going to die, and urged her not to think of such a thing. He testified that he was in her room at her mother's house about two weeks before her death, and that she then asked him whether he had had her will prepared as she had requested, and that he told her he had not, and that he remonstrated against her saying that she was going to die. He says that she then asked if she could dispose of her property without making a will, and he told her she could transfer the real estate by making a deed, and that she could transfer the notes and mortgages by indorsing them. He testifies that she then said, "Can I indorse the notes over, and, if so, would that be legal?" and that he told her it would be legal, and that she then went and got her notes and indorsed them. He testified that she wrote her name on the backs of the notes, and then gave and

delivered them to him. He says that she had the notes
in her room, and got them and indorsed them by writ-
ing her name on the backs of each of them, in his
presence, and delivered them to him. He says that
she was reclining on the couch when she indorsed the
notes and gave them to him, and that she placed the
notes on a book when she indorsed them. Shortly after
the death of Liverne, the defendant told Mrs. Minnie
Baber that Liverne had given him those notes, and
he told others of it, and, a little later, he showed to
Minnie Baber all of the notes that Liverne had given
him and her signature on the back of each note. The
defendant testified that when Liverne gave him the
notes, he put them in his pocket, and took them away.
The evidence of the defendant shows, if it is true, a
gift of *causa mortis*. The defendant testified that
Liverne told him that she wanted him to have the
property, and that she did not want her mother to
have it. The defendant says that when he told Mrs.
Baber that Liverne had given him the notes, she pro-
tested a little against it, and asked him to show them to
her, which he did. Mrs. Baber says that the defend-
ant told her that Liverne had given him the notes, and
that, when he showed her the notes and the indorse-
ments on them, she remarked that the writing did not
look like Liverne's.

About two weeks after Liverne's death, the plain-
tiffs signed a petition, asking the County Court of
Washington County, to appoint the defendant admin-
istrator to Liverne's estate, and in this petition, signed
by the plaintiffs, is the following statement:

"Your petitioners desire to show unto your honor
that the estate of the above deceased originally con-
sisted of more personal property than the amount
above stated, but that said personal property was given
to C. C. Caples by the deceased a considerable time

before her death; and your petitioners wish to state
that the gift as above stated is in accordance with the
wish of your petitioners, and entirely satisfactory to
them in every respect.''

This petition seems to have been written by the de-
fendant's brother.

In her evidence (page 59), Mrs. Minnie Baber says
that, *if* her daughter gave the notes to the defendant,
she wanted him to have them, and that she had no dis-
position to break what her daughter had done. The
plaintiffs testified that Liverne never told them that
she had given any property to the defendant; nor did
she say anything to either of them about disposing
of her property, and the defendant did not tell either
of them, until after Liverne's death, that she had given
him any property. No person was present when the
gift was made but Liverne and the defendant.

Shortly after Liverne's death, Mrs. Baber employed
S. B. Huston, Esq., to investigate the gift of the notes
to the defendant, with the intention of instituting legal
proceedings to recover the notes from him if grounds
therefor should be found, and Mr. Huston made the
examination. The plaintiffs produced him as a wit-
ness, and examined him in relation to that matter.
Mr. Huston said this examination was made within a
few months after the death of Liverne, and hence it
must have been in 1900.

Mrs. Baber furnished Mr. Huston with genuine sig-
natures of Liverne's for comparison with the indorse-
ments on the notes, and Mr. Huston called on the de-
fendant and informed him what he was doing. The
defendant delivered the notes in question to Mr. Hus-
ton for examination, and he permitted Mr. Huston to
retain the notes for quite awhile. Mr. Huston says
that he went over the matter carefully, and compared

the signatures of Liverne's which her mother had furnished him with her name on the notes, and he says that the indorsements on the notes seemed to him to be genuine and all right, and he so informed Mrs. Baber. He asked Mrs. Baber, if she had any reason to doubt the genuineness of the signatures on the indorsements, and, according to his recollection, she said "No."

The defendant settled the estate of Liverne and turned over to the plaintiffs, as her heirs, the real estate, appraised in 1900, at $2,700, and there are receipts in evidence showing that, on January 26, 1902, Minnie Baber received of the defendant, as administrator of the estate of Liverne H. Baber, deceased, in full of her interest in the personal property of said estate, the sum of $1,029.31, and another receipt of the same date, showing that she, as guardian of Josephine Baber, received from the defendant the further sum of $1,029.31 in full of Josephine's interest in the personal estate of Liverne. This indicates that the plaintiffs received at least $4,758.62 from the estate of Liverne. On page 60 of the evidence Minnie Baber, in answer to the question whether the defendant told her how much Liverne had given him, answered, "He gave us $3,000 and said the rest was his." We are not certain just how much the plaintiffs received of the estate of Liverne, but it seems certain that they received at least $4,758.62.

The plaintiffs produced a handwriting expert, named W. W. Williams, who was not acquainted with Liverne H. Baber, and did not know her handwriting. Two of the promissory notes that Liverne gave to the defendant, and several signatures of Liverne's that were shown to be genuine, were submitted to this witness for examination and comparison. He compared the

signatures that were shown and admitted to be genuine with her name on the indorsements on the notes. He testified that the name of "Liverne H. Baber" written on the backs of the said two notes was a "simulated forgery," and not written by her, and gave his reasons for his opinion.

That is all of the evidence that was produced to show that the said indorsements were not genuine. The defendant testified that these signatures were genuine, and that he saw Liverne write them. His testimony is the same as to the indorsements on the other notes.

There was no evidence tending to show that the gift of the said notes to the defendant was the result of fraud or any undue or improper influence, excepting the evidence showing the relations between the defendant and Liverne. The evidence of the defendant was positive that he exerted no persuasion or other influence to induce Liverne to give him the property.

There was considerable said in the evidence about his accounts as executor and trustee of the estate of Granville H. Baber, and as administrator of the estate of Liverne H. Baber; but these accounts were approved and settled in the probate court, and there was no evidence showing that they were incorrect. However, they had little bearing on the issues of this case.

1. The first point for consideration is whether Liverne H. Baber gave these notes to the defendant, or whether the indorsements on the notes were genuine or forgeries.

2. If the indorsements on the notes were *forgeries,* it would be probable that the defendant's contention that the notes were given to him was false, although the indorsements of promissory notes is not necessary to the validity of a gift of promissory note, *causa mortis.* A gift *causa mortis,* like a gift *inter vivos,*

must be completely executed, and go into immediate effect.

A gift *causa mortis,* to be valid, must be accompanied by an actual and complete delivery of the property by the donor to the donee. In this respect there is no difference between a gift *causa mortis* and a gift *inter vivos:* 14 Am. & Eng. Ency. L. (2 ed.), 1056.

3. However, whether the gift is *causa mortis* or *inter vivos,* if the subject of the gift is a promissory note or other chose in action, the actual delivery of the written evidence of the debt is valid, without any assignment or indorsement: 14 Am. & Eng. Ency. L. (2 ed.), p. 1059.

4. The disposition of personal property by gift *causa mortis* has been recognized and upheld by the courts from an early period, and is a fixed principle of jurisprudence in all civilized countries, and such gifts, if made by competent persons, and fully executed, are perfectly valid, in the absence of fraud or undue influence, provided the rights of creditors are not affected.

5. The common law does not encourage gifts of this nature, and they are sustained only upon clear proof of all the essential facts necessary to constitute such a gift. The rule, however, is not carried to the extent of holding that the presumption of law is against such gifts. Notwithstanding the fact that gifts of this nature are watched with jealousy on account of the opportunity they afford for fraud, there is no presumption, either in favor of or against such gifts, and the quantity of evidence necessary to sustain them is no greater than that required in other civil causes. Such gifts may be supported by a fair preponderance of the evidence: 14 Am. & Eng. Ency. L. (2 ed.), 1067.

6. Mr. Williams, the handwriting expert, testifies that he is positive that the name of Liverne H. Baber on the backs of the two notes shown him are forgeries. These papers and others were submitted to him for his opinion by one of the plaintiffs' attorneys, several months before he gave his evidence, and before the suit was commenced. Opinion evidence in relation to handwriting is generally viewed with caution by the courts. Such experts are usually very ardent supporters of the side that calls them.

Taylor, in Volume 1 of his work on Evidence (8 ed.), Section 58, speaking of skilled witnesses generally, says:

"Perhaps the testimony which least deserves credit with a jury is that of *skilled witnesses.* These gentlemen are usually required to speak, not to facts, but to *opinions;* and, when this is the case, it is often quite surprising to see with what facility and to what an extent their views can be made to correspond with the wishes or the interests of the parties who call them. They do not, indeed, willfully misrepresent what they think; but their judgments become so warped by regarding the subject in one point of view that, even when conscientiously disposed, they are incapable of expressing a candid opinion."

This author in the same section, appositely, but reverently, adds:

"Being zealous partisans, their belief becomes synonymous with faith as defined by the apostle, and it too often is 'but the substance of things hoped for—the evidence of things not seen.' "

In the *Tracy Peerage Case,* 10 Cl. & Fin. 191, Lord Campbell says:

"Hardly any weight is to be given to the evidence of what are called scientific witnesses. They come, with a bias on their minds, to support the cause in which they are embarked."

In *Wendl* v. *Fuerst,* 68 Or. 283 (136 Pac. 1), this court held:

"We believe the rule stated by Rogers, *supra,* is the correct one, and that the evidence of experts in all cases should be received and weighed with caution."

We find from the evidence that Liverne H. Baber did give the promissory notes in controversy to the defendant; that she indorsed each of them with her own hand, and delivered them to the defendant with the intention to vest the title of these notes in him, and that he received and accepted said notes as a gift *causa mortis.* The gift was complete in every respect.

The other question for our determination is, was the gift of the promissory notes by Liverne H. Baber to the defendant the result of fraud or undue influence, exerted upon her by the defendant? It is admitted that the defendant was executor and trustee of her father's estate, and that, after the defendant turned over to her her portion of said estate, he assisted her in managing her estate to some extent, and that he attended to business for the plaintiff Minnie Baber. It is also admitted that he was engaged to marry Liverne, and that he called upon her often. Apart from these facts, there is no evidence before the court tending to prove that the plaintiffs' contention that said gift was obtained by fraud or undue influence. The plaintiffs testified to nothing tending to show undue influence. No witness gave evidence tending to prove fraud. The defendant swears fully and positively that he was not guilty of any fraud or of any undue influence, and that he did nothing to induce her to make said gift.

Liverne was about 24 years of age when she died, and she had had advantages of education. It is not claimed that she was a person of weak mind, or that

she was not a person of at least average intelligence
and ability.

7. A relation of confidence exists between a man
and a woman that are engaged to be married.

Bigelow, in his work on Fraud (1 ed.), page 271,
says:

"Undue influence may be exercised under the inti-
mate relation created by an engagement to marry.
Thus if a woman gives a man land upon a promise of
marriage, and he then refused to marry her and con-
tinues to hold the land, this is a fraud for which the
law will give the woman proper relief. So, on the
other hand, if a man should, after such solicitation and
hesitancy, convey land, without adequate pecuniary
consideration to a woman who had promised to marry
him, and who had thereby gained great influence over
him, her refusal to marry him would afford him ground
for rescinding the conveyance."

In the case of *Rockafellow* v. *Newcomb,* 57 Ill. 194,
the facts were that the plaintiff and the defendant
were engaged to be married, and the plaintiff, at the
persistent solicitations of the defendant, conveyed to
her certain lands in Chicago, and the defendant, at
the same time, conveyed to him lands in Iowa. The
woman refused to marry the man, and he brought suit
to rescind the conveyance on the ground of fraud.
Passing on the case, the court says, *inter alia:*

"The relation of the parties [who are engaged to
be married] was of the most confidential character.
* * She [the defendant] had an undue influence over
him, and took advantage of the relation between them.
That this influence existed, and was exercised to the
great benefit of one, and to the great disadvantage of
the other, there can be no doubt. There could be no
relation between persons where a greater influence
could be exerted and an undue purpose more easily
achieved. The situation of the parties; the close
intimacy; the loving correspondence; the threat to

annul the marriage contract; the great difference in the value of the two pieces of property—all raise the presumption of undue influence. She worked upon his passions, excited his fears, and alarmed him by the dread of separation. The relief to be granted in such cases stands upon a general principle, which applies to all the variety of relations in which dominion may be exercised by one over another."

In cases like this, where a confidential relation exists, and there is great opportunity for fraud, it is incumbent on the donee to show that the gift was not obtained by fraud or undue influence: *Gilmore* v. *Burch,* 7 Or. 374 (33 Am. Rep. 710); *Baldock* v. *Johnson,* 14 Or. 542 (13 Pac. 434); *Wade* v. *Pulsifer,* 54 Vt. 45; *Gilmore* v. *Lee,* 237 Ill. 402 (86 N. E. 568, 127 Am. St. Rep. 330); *Caspari* v. *First German Church,* 12 Mo. App. 293; *Jenkins* v. *Jenkins,* 66 Or. 12 (132 Pac. 542); 1 Story, Eq. Jur. (13 ed.), § 312; *Page* v. *Horne,* 11 Beav. 235; *Huguenin* v. *Baseley,* L. C. in Equity, note pp. 119, 120.

In *Page* v. *Horne,* 11 Beav. 235, the master of the rolls, says:

"It is true that no influence is proved to have been used; but no one can say what may be the extent of the influence of a man over a woman whose consent to marriage he has obtained. Here, the husband having mortgaged the property, we are told by the report of the master that no undue influence was used. The court, however, will look with great vigilance at the circumstances and situation of the parties in such cases as the present, and will not only consider the influence which the intended husband, either by soothing or violence, may have used, *but require satisfactory evidence that it has not been used.*"

In the note of *Huguenin* v. *Baseley,* L. C. in Equity, note page 119, it is said:

"The influence of a man over a woman to whom he is engaged to be married is presumed to be so great

that the court will look with great vigilance at the
circumstances and situation of the parties, and will
consider, not only the influence which the intended hus-
band, either by soothing or violence, may have used,
but require satisfactory evidence that it has not been
used.''

In *Gilmore* v. *Burch,* 7 Or. 374 (33 Am. Rep. 710),
the court says:

''The law seems to be well settled that when one ac-
cepts a confidential or fiduciary relation to another,
* * where the donee or grantee is supposed to ex-
ercise an unusual and commanding influence over the
grantor, the courts will set aside the conveyance, unless
the grantee can show that the transaction was fair, and
without fraud or undue influence.''

The rule is well settled in this state and elsewhere
that where a confidential relation is shown to have
existed between a donor and a donee, and a gift was
made by the former to the latter during the existence
of this relation, courts of equity will annul the gift,
unless the donee shows that the gift was made without
fraud or undue influence. This principle applies to
a gift *causa mortis* made by a young woman to a
young man to whom she was engaged to be married.

It appears that the plaintiffs were informed by the
defendant, in March, 1900, a few days after the death
of Liverne, as stated *supra,* that she had given the
promissory notes in dispute to him, and that he ex-
hibited the notes to Minnie Baber, shortly after he
informed her of the gift. Soon after that, the latter
caused an attorney to investigate the gift with a view
of recovering the notes, if possible. This attorney, as
stated *supra,* obtained from the defendant the notes in
question, and compared the indorsements on the notes
with the handwriting of Liverne, and informed Mrs.
Baber that he believed the indorsements to be genuine,

71 Or.—15

and he asked her at that time whether she had any reason to doubt the genuineness of the indorsements on the notes, and she answered in the negative. Mr. Huston made this investigation in 1900, about 12 years before this suit was begun. Minnie Baber knew the facts concerning said gift then as fully as she knew them in 1912, when she instituted this suit. The evidence given by her and Josephine shows that they knew as much about the case in 1900 as they did when they testified. They had the opinion of the handwriting expert to the effect that he believed the indorsements to be forgeries, but that opinion was of no value to them. They *acquiesced* in this gift for the period of more than 12 years after they knew as much about it as they did when they commenced this suit, and this acquiescence is *laches.* It is one of the principal maxims of equity jurisprudence that equity aids the vigilant and not those who slumber on their rights.

16 Cyc., page, 152, says:

"No arbitrary rule exists for determining when a demand becomes stale or what delay will be excused, and the question *of laches* is to be decided upon the particular circumstances of each case. No greater certainty of treatment is therefore practicable than to indicate the elements generally considered. While some delay in the assertion of a right is always an essential element of laches, unreasonable delay alone, independently of any statute of limitations will often operate as a bar to relief. * * "

The same volume, on page 158, says:

"The border land between laches proper and mere staleness of demand is found in those cases where mere lapse of time is added to an element of assent to or acquiescence in the adverse claim. Starting with the doctrine that one who has affirmatively, by words or conduct, indicated his assent to the claims of another is guilty of laches, if he thereafter, for a long time,

makes no assertion of his own conflicting claim, the courts apply the same rule where there has been acquiescence alone, and presume assent from lapse of time, and failure to assert their right. Particularly is this so where the plaintiff attempts to assert an interest in land after long acquiescence in defendant's possession under claim of right, or when he attempts to enforce a covenant or a condition after considerable acquiescence in continuing breaches."

In *Sullivan* v. *Railway Company,* 94 U. S. 807 (24 L. Ed. 324), the court says:

"To let in the defense that the claim is stale, and that the bill cannot therefore be supported, it is not necessary that a foundation be laid by any averment in the answer of the defendants. If the case, as it appears at the hearing, is liable to the objection by reason of the laches of the complainant, the court will, upon that ground, *be passive and refuse relief.* Every case is governed chiefly by its own circumstances; sometimes the analogy of the statute of limitations is applied; sometimes a longer period than that prescribed by statute is required; in some cases a shorter period is sufficient; sometimes the rule is applied when there is no statutable bar. It is competent for the court to apply the inherent principles of its own system of jurisprudence, and decide accordingly."

In *Smith* v. *Clay,* Amb. 647, Lord CAMDEN says:

"Nothing can demand the assistance of the court (of chancery) *but conscience and reasonable diligence. Laches and neglect are discountenanced here.*"

In *Hayward* v. *National Bank,* 96 U. S. 617 (24 L. Ed. 855), the court says:

"Courts of equity often treat a lapse of time, less than prescribed by the statute of limitations, as a presumptive bar, on the ground 'of discouraging stale claims, or gross laches, or unexplained *acquiescence* in the assertion of an adverse right.' "

In *Sedlack* v. *Sedlack,* 14 Or. 541 (13 Pac. 452), the court says:

"The general rule, without doubt, is that no lapse of time or delay in bringing the suit will be a bar to the remedy in equity, providing the injured party, during the interval, was ignorant of the fraud. But the ignorance of such party must not have been negligent; for if, by reasonable diligence, the fraud could have been discovered, or ought to have been known, he will be deemed guilty of laches, or of acquiescence, and equity will refuse to interfere. In many cases courts of equity act upon the analogy of the statute of limitations. But independent of this, it is a favorite doctrine of equity to allow a defense to be based on a mere lapse of time, and staleness of the claim, denominated laches, when the delay has been passive and acquiesced in for a great length of time."

If the plaintiffs had a right of suit, they should have instituted the suit a long time before they did. By delaying to commence their suit for about 12 years, they very likely made it more difficult than it otherwise would have been for the defendant to obtain evidence for his defense. After the lapse of a dozen years, facts are more or less forgotten, and proof becomes difficult.

We think that the plaintiffs have been guilty of laches sufficient to bar their right of suit.

The notes in question were the absolute property of the donor, Liverne H. Baber, and she had a legal right to dispose of them in any manner that she desired. There may be a difference of opinion as to whether she acted wisely in giving them to the man to whom she was engaged to be married. But *she* was the person to decide that question, and we have no authority to pass on the wisdom of her act, or to annul what she did, if she was not imposed upon by fraud or undue influence. Persons have the right to give

away all of their property to whomsoever they wish, and, if they do so, and the gift is not induced by fraud or undue influence, no one can legally impeach it but the creditors of the donor. Gifts are void as to creditors, as donors are required to be just before they are generous. Liverne gave the defendant about 61 per cent of her property and left the residue for the plaintiffs.

If the defendant's evidence is true, he was not guilty of any fraud or undue influence, and the property in question was given to him by Liverne as her free act, without persuasion or any influence from him. His evidence is the only testimony on the subject, and he is not impeached or discredited to any extent. His interest, however, in the result of the suit has to be considered in weighing his evidence. We cannot *know* what the truth is in relation to this gift. When the facts are in dispute, courts are constrained to act on probabilities, as indicated by the evidence before them.

We find that the promissory notes in question were given to the defendant by Liverne H. Baber as her free act, and that said gift was not induced by any fraud or undue influence on the part of the defendant, and that the decree of the court below is erroneous, and should be reversed.

The decree of the court below is reversed, and this suit is dismissed; but neither party shall be allowed costs or disbursements, either in this court or in the court below.       REVERSED AND SUIT DISMISSED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE MOORE and MR. JUSTICE BURNETT concur.