Argued January 11, modified February 16, 1915.

## LEE v. NORTH PACIFIC LUMBER CO.

(146 Pac. 131.)

**Principal and Agent—Contract—Share of Profits—Construction.**

1. Under a contract to act as defendant's agent in the sale of lumber for a guaranty of $2,400 a year and one fourth of the profits, not fixing any basis on which profits should be estimated, and under which defendant did not keep an account of the cost of manufacturing the lumber sold by the agent or of the details of its different departments separate from an account of cost for the plant as a whole, the profits were to be fixed by ascertaining the cost of manufacturing the particular lumber sold by the agent, which should bear its full share

of the expense incurred in producing it, not including any part of any profits or losses on other sales.

[As to right of agent to file bill against principal for an accounting, see note in Ann. Cas. 1914B, 1028.]

**Principal and Agent—Contract of Sales Agent—Share of Profits— Method—Cost of Production.**

2. Under such contract the business done by the agent during any year was closed at the end of that year; and in estimating the profits. in any one year he was not entitled to a share in defendant's profits on towing logs to its mills with its own boats as a *pro rata* reduction of the price of the logs, and was chargeable with the average cost per thousand of the lumber sold by him, as of the year of its manufacture, including its share of the average cost of the mill, boom, chute, wood, and lath and dock crews, diminished by a *pro rata* share of the amount realized from the by-products, and with the average cost of the lumber allowing for the average gain in scale for each year, deducting a share of the amount of salaries and expenses not on the pay-roll, and one half of maintenance expenses.

**Principal and Agent—Contract of Sales Agent—Guaranty—Construction.**

3. The guaranty of $2,400 a year was an item of expense to be charged against the business of any year before striking a balance, and if the profits did not bring $2,400 to the agent, he would receive that amount under the contract, and if the profits made his share more than $2,400, he was entitled to that share without making a deduction of the $2,400.

From Multnomah: ROBERT G. MORROW, Judge.

Department 2.    Statement by MR. JUSTICE HARRIS.

This is a suit for an accounting, and has required the examination of a plethora of figures. The defendant owns and operates a large lumber manufacturing plant. The establishment consists of a sawmill, planing-mill, dry kiln, sidetracks, dock, yards and such equipment as is usually found connected with a large mill. The plant represents an investment of approximately half a million dollars. The annual output varies between 50,000,000 and 75,000,000 feet of lumber. About 200 men are employed in the various departments of the company, and it costs between $200,000 and $300,000 each year to maintain and operate this industry.

Desiring to increase its export business, especially in South Africa, defendant made an agreement with the plaintiff whereby the latter was to act as agent for defendant in South Africa. The terms of the agreement are evidenced by a letter written by defendant to plaintiff and accepted by plaintiff, and the writing is as follows:

"North Pacific Lumber Company.
"Portland, Oregon, August 13, 1903.
"Mr. N. P. Lee, City—

"Dear sir: We hereby confirm agreement made with you verbally, under which you are to come into our employ for a period of one (1) year from September 1st, 1903, your duties being to represent and act for us as agent in South Africa, your compensation to be one fourth (¼) of the profits of the business obtained by you.

"You are not to be liable for losses except so far as such losses curtail profits. We guarantee that the said one fourth interest in the profits shall not be less than $2,400; your traveling and living expenses to be charged in this venture until you are permanently located.

"It is a condition of this agreement that you give us all of your time, engaging in no other business or employment except as may be approved by us, this agreement to be extended for a period of four (4) years after its conclusion if mutually agreeable.

"Please signify your assent to these terms by signing a memorandum at the foot thereof.

"Yours truly,
"E. T. Williams,
"Manager.

"Above terms accepted.

"L. P. Lee."

It will be observed that the employment begins September 1, 1903. Pursuant to the agreement plaintiff proceeded to South Africa, and there actively

entered upon the performance of his duties. The first year having expired, the parties did not extend the agreement for the definite period of four years, as provided for in the writing; but, the parties being agreeable thereto, the plaintiff continued to represent the defendant until September 18, 1906, when the agency was terminated. Plaintiff was abroad in the interest of the company until January 6, 1906, when he returned to Portland, Oregon, where he remained until April, 1906, when he went to California in the interest of the company. The parties have construed the agreement to apply to all business obtained by plaintiff. The lumber sold abroad is mentioned in the record as the export business, and the lumber disposed of in California is referred to as the California business. The foreign shipments are identified by the names of the vessels carrying the cargoes, while the California shipments are identified by the names of the respective purchasers. The Elfrieda was the only shipment made the first year. Four sales were made during the second year, and they consisted of the Durbridge, Owenee, Christel and Pythomene shipments; and the sales made during the third year included the Haddon Hall, Balmore, Emilie, Kilburn, Erasmo and Manchester Port shipments, together with the California business, which embraced the Acme Lumber Company, MacDonald Lumber Company, Sudden & Christenson, S. H. Harmon Lumber Company and A. W. Beale & Co. shipments.

The defendant claims that the business procured by plaintiff resulted in a loss, and that therefore there are no profits to divide; while the plaintiff contends that the business was profitable. The plaintiff was awarded a decree and judgment for $10,933.45, and the defendant appeals.                                    MODIFIED.

For appellant there was a brief over the names of *Mr. Thomas N. Strong* and *Messrs. Dolph, Simon, Mallory & Gearin,* with oral arguments by *Mr. Strong* and *Mr. Joseph Simon.*

For respondent there was a brief over the name of *Messrs. Carey & Kerr,* with an oral argument by *Mr. Charles H. Carey.*

MR. JUSTICE HARRIS delivered the opinion of the court.

1. The contract provides that the plaintiff shall receive as compensation for his services one fourth of the profits of the business obtained by him. The parties are agreed upon what was obtained, and there is no dispute as to the receipts of the business. There is no provision in the agreement fixing a basis from which "profits" are to be estimated. The differences between the plaintiff and defendant result from the variant methods employed in attempting to ascertain the cost of the lumber manufactured and sold. The cost of manufacturing the lumber sold by plaintiff was not kept as a separate account on the books of the company, and the defendant insists that the only accurate method for determining the manufacturing cost is to consider the plant as a whole, and ascertain the average cost per 1,000 feet from the total output of the mill and the expense of operating the entire business of defendant. The plaintiff rejects the method proposed by defendant, and the former contends that the only fair way is to ascertain as near as possible the cost of producing the particular shipments sold by him. We are of the opinion that the plan offered by defendant is neither accurate nor fair. The plaintiff is in no way concerned with either the profits or losses

on any business not obtained by him, because his compensation is to be determined by the profits on the lumber that he, and not some other person, sold. The failure of the parties to agree on a cost price and their neglect to provide for a method by which the cost price shall be determined makes the problem a difficult one to solve. The defendant operates its business as a whole, and does not keep separate accounts of all the details of the different departments. There is no way of showing how or where every part of any specified log is disposed of. A portion of a log may or may not go to the planer; some part may be sold in Portland, and in such case delivery is made with the wagons and teams of the company. The slabs taken from a given log may be small or large. One log may be practically all clear, while another may produce little or no clear lumber. The lumber manufactured from a given log may pass through the hands of many employees, or it may be handled by only a certain number of the different crews. The conditions existing make it impossible to reach an exact and accurate determination of the cost of manufacturing the lumber sold by plaintiff. Not one of the expert accountants was able to sustain the claim that any given method was exactly correct, because in every case an estimate or an approximation somewhere entered into the calculation. While it must be conceded that the exact cost of the lumber sold by plaintiff cannot be ascertained, still the parties are entitled to have the cost determined by a method which will be not only fair, but will also reveal the exact cost as near as conditions permit. The lumber sold by plaintiff should bear its full share of the expense incurred in producing that lumber, but the business obtained by plaintiff is not entitled to share in the profits realized from other business done by the com-

pany, and the lumber sold by plaintiff should not be compelled to bear any part of any losses resulting from other sales.

Expert accountants testified for both parties; and, as usual, these experts became advocates for their respective clients: *Baber* v. *Caples,* 71 Or. 212 (138 Pac. 472, 475). In many ways the manufacturing cost was minimized by the plaintiff and enlarged by the defendant. Before discussing the question of profits and losses it is necessary first to state the rule of law which, in our opinion, is applicable.

2. The plaintiff acted as selling agent for the company from September 1, 1903, until September 18, 1906. The contract fixes the compensation as one fourth of the profits of the business obtained by the plaintiff with a guaranty of $2,400. The parties understood this clause of the contract to mean a guaranty of $2,400 for each year. The profits or losses of one year's business cannot be carried to the following year. If there was a loss the first year the defendant is not entitled to have that loss carried to the next year. If there was a profit the second year, but not sufficient to increase the amount of the guaranty, then the plaintiff is not entitled to have that amount carried to the third year. The business done during any one year is closed with the end of that year. The defendant cannot charge the losses of one year against the profits of a succeeding year: *Jennery* v. *Olmstead,* 90 N. Y. 363. Applying the rule just stated, the business done by plaintiff covers three annual periods, the first ending September 1, 1904, the second terminating September 1, 1905, and the third closing with September 18, 1906.

There are two principal items entering into the calculations. One item is the cost of the log delivered

at the mill, and the other is the expense of manufacturing the log into the lumber sold by plaintiff.

There is no way of knowing just what log rafts were cut, but it appears from the evidence that, generally speaking, the South African trade required a good quality of lumber. We have determined the cost of the logs by the quality and sizes of the lumber called for in the specifications and the prices paid for logs necessary to produce the lumber specified. To the price of the log 40 cents is added for towing. The defendant owns two boats used for towing purposes, and the company operated these two boats at a profit. The plaintiff therefore claims that he is entitled to a share in the profits to the extent of a *pro rata* reduction on the price of the log; but this is only demanding to receive from one department that which the plaintiff declines to take from other departments of the business. Forty cents per thousand for towage is a fair charge, and it is, in fact, less than the usual charge.

We now come to a consideration of the cost of manufacturing the log, and many items enter into the calculation. The first item to which attention is given is the gain in scale. There is, as a rule, a gain in lumber feet over log feet as scaled. The plaintiff claims a difference in scale ranging from a loss of 5 per cent to a gain of 25 per cent. The books of the company show exactly the aggregate of log feet purchased each year and the amount of lumber feet manufactured during the same period; and, notwithstanding this fact, the expert accountants do not agree on the gain in scale. We think the evidence supports the conclusion that the gain in scale was 13 per cent for 1904, 8.87 per cent during 1905, and 7.31 per cent in 1906, and in calculating the cost of the lumber we make a uniform allowance for a gain in scale on the basis mentioned.

It is a mere guess to attempt to estimate the loss or gain in scale as is done by plaintiff. In the very nature of things, it can only be an approximation to say that in flooring and ceiling there was a loss of 5 per cent, while in another kind of lumber there was a gain of 25 per cent. It is true that there may be a loss on some lumber and a considerable gain on other lumber, but there is no way of knowing just what that gain or loss is. It seems to us that it is fairer to apply the gain disclosed by the books, because we know what that gain is, and are not obliged to resort to mere estimates.

The parties are not agreed on the disposition to be made of the receipts from by-products such as sawdust, slabwood and laths. The expert for plaintiff credits the total receipts from by-products to the payroll of the mill, boom, repair, chute and wood crews and lathmill, which will result in greatly minimizing the cost of manufacture. Every dollar expended in the operation and maintenance of the business conducted by the company is entitled to its *pro rata* share of the moneys received from by-products, and consequently the expense of manufacturing the lumber sold by plaintiff is entitled to its proper share, and not all, of the receipts from by-products. The plaintiff does not wish to be charged with the expense of delivering a load of slabwood, and at the same time claims all the benefit of the moneys derived from such delivery. The fair way is to credit plaintiff with his rightful share of the profits and to charge him with a just proportion of the burdens. We have therefore endeavored to ascertain just what crews and departments handled the products sold by plaintiff, and have charged plaintiff with the average expense thereof per 1,000 feet, after giving such expense its *pro rata* share

of the receipts from by-products. The plaintiff is not entitled to any profits on account of the first year, because he admits that the profits, if any, on that year's business were not sufficiently large to increase the amount of the guaranty; and we therefore pass to the business of the second year. The shipments sold during the second year were the Durbridge, Owenee, Christel and Pythomene, the first of which was sold and shipped in 1904, and the remaining shipments in 1905. The manufacturing cost of the Durbridge shipment is to be measured by the cost of manufacture during 1904, and the other shipments by the manufacturing cost in 1905. The total expense of operating the plant in 1904 was $252,212.01; the receipts from by-products aggregated $34,040.84; and the total output of the mill was 57,900,287 feet. In 1905 the defendant manufactured 85,211,326 feet of lumber at a gross cost of $353,701.10, and realized from the by-products the sum of $50,048.21. All the remaining shipments belong to the third year. The Haddon Hall and Balmore cargoes were sold in November, 1905, but were not shipped until March, 1906, and consequently the manufacturing cost of these two cargoes, as well as of all the other shipments made during the third year, are to be measured by the cost of manufacture for 1906. The company paid $365,077.51 in 1906 to manufacture 73,953,953 feet of lumber, and received $48,359.59 for by-products. The business done by plaintiff is chargeable with the average cost per 1,000 feet of the mill, boom, repair, chute, wood, lath and dock crews, giving the expense thereof a *pro rata* share of the receipts from by-products; and the plaintiff is also to be charged with the average cost per 1,000 feet, after making proper deductions for by-products, for salaries and expenses not on the pay-roll,

and one half of maintenance expenses. The mill, boom, repair, chute, wood and lath crews cost the gross sum of $79,546.30 in 1904; $121,759.34 in 1905; and $130,113.46 in 1906. In 1904 the dock crew was maintained at a total expense of $5,452.85 and 15,133,999 feet were handled by that crew; in 1905 the dock crew handled 26,598,613 feet at a total expense of $8,168.89; and in 1906 it cost the company the sum of $5,710.87 for the dock crew to take care of 33,756,177 feet. In 1904 salaries and expenses not on the pay-roll, plus one half of maintenance expenses, amounted to $49,038.31; in 1905 was $54,913.50; and in 1906 aggregated $56,048.95. After making the proper reductions for receipts from by-products, our calculations make $2.22 as the average manufacturing cost per 1,000 feet in 1904; $2.05 for 1905; and $2.36 in 1906.

We shall now consider in detail the shipments sold during the second year:

The Durbridge: The logs and towing are figured at $6.90; the cost of manufacture at $2.22, but an additional $2.50 is allowed on 162,670 feet, making a total cost of $15,916.27 for 1,917,974 feet shipped, for which defendant received $17,674.52. The profit was $1,758.35.

The Owenee: The logs and towing are figured at $7.27; the cost of manufacture at $2.05. The total cost of 2,111,073 feet shipped was $18,513.86; the receipts were $18,244.83, and a loss of $269.03 resulted.

The Christel: The pine logs are figured at $7.65 and the hemlock at $4.54; the cost of manufacture $2.05 with $1 added for 94,642 feet. The company received $12,385.02 for a cargo of 1,438,412 feet which cost $12,384.11, leaving a profit of 91 cents.

The Pythomene: The logs are figured at $7.40 and the manufacturing cost at $2.05, making a total cost of $14,446.01 for 1,642,785 feet. The receipts were $17,355.55, and the profits $2,909.54.

The net profit for the second year, not deducting living and traveling expenses incurred by the plaintiff, was only $4,399.77, and therefore plaintiff is not entitled to any profits made during the second year over and above the guaranty which was paid to him each year.

The business obtained during the third year was more profitable.

The Haddon Hall: The logs are figured at $7.57, and the cost of manufacturing at $2.36, with an additional $2.50 for 88,483 feet. The company purchased 84,447 feet from the Portland Lumber Company at an expense of $871.87. The company received $13,053.22 for this cargo of 1,082,863 feet, which was shipped at a cost of $10,386.19, leaving a profit of $2,445.83.

The Balmore: Logs are figured at $8.40 for the select and clear lumber, and at $7.90 for the merchantable; the cost of manufacturing was $2.36, with $1 added for band sawing 99,360 feet. This cargo of 1,139,745 feet cost $11,033.26 and brought $13,057.07. The profit was $2,023.81.

The Emilie: The logs are figured at $10.40, and the cost of manufacturing at $2.36. The company purchased 473,487 feet at an expense of $15,121.60. The total cost of this cargo of 1,383,963 feet was $26,047.08, and the receipts $35,248.04, leaving a profit of $9,200.96.

The Kilburn: The merchantable logs are figured at $8.90, and the logs for select and clear lumber at $9.90; the cost of manufacture at $2.36, with $1 added for band-sawing 778,818 feet. The company shipped this

cargo of 2,131,187 feet at an expense of $24,929.25, and was paid $29,857.16, thereby making a profit of $4,927.91.

The Erasmo: Logs for merchantable lumber are figured at $8.90, and for select and clear lumber at $10.-40; the manufacturing cost at $2.36, with $1 added for band-sawing 527,328 feet. This cargo of 1,710,153 feet brought $20,347.65, and cost $20,648.20, leaving a loss of $300.55.

The Manchester Port: Logs for merchantable lumber are figured at $9.40, and for select and better lumber at $12.40, while $2.36 is allowed for manufacturing. The company paid $26,438.75 for this cargo of 2,029,-094 feet, and received $27,157.50, and realized a profit of $718.75.

Acme Lumber Company: The logs are figured at $10.40 and manufacturing at $6.86. The company paid $7,255.36 for 439,725 feet, and received $8,618.39. The profit was $1,363.03.

MacDonald Lumber Company: 185,239 feet were produced from $9.90 logs, and the manufacturing cost was $6.86; and 540,900 feet were sawed from $8.90 logs at a cost of $2.36. The total cost of 726,139 feet was $8,709.18, and the receipts $11,089.12, leaving a profit of $2,379.94.

Sudden & Christenson: The logs are figured at $10.40, and the manufacturing cost at $6.86. The company received $3,831.64 for 174,007 feet which cost $2,871.08, and the profit realized was $960.56.

S. H. Harmon Lumber Company: In this shipment of 1,546,725 feet, logs figured at $10.40 produced 260,273 feet, and the manufacturing expense was $6.86, while the remainder of the shipment came from $8.90 logs which cost $2.36 to manufacture. The total re-

ceipts were $21,826.72, and the aggregate expense $17,942.92. The defendant made a profit of $3,883.80.

A. W. Beale & Co.: The defendant shipped 681,148 feet, of which 68,706 feet were sawed from $10.40 logs, and the remainder from $8.90 logs. The manufacturing cost is figured at $6.86 for 389,819 feet; $4.36 for 57,171 feet; $3.36 for 7,133 feet; and $2.36 for 227,025 feet. The total receipts were $10,193.57, and the entire expenses $9,197.73, leaving a profit of $995.84.

On the business obtained during the third year the defendant made a profit amounting to $28,599.88, but from this sum is yet to be deducted the traveling and living expenses incurred by plaintiff during that year. The record does not afford any way of ascertaining the exact sum so expended between September 1, 1905, and January 6, 1906, and we have been obliged to estimate the amount. We do know from the record, however, the amount expended after January 6, 1906. We have allowed as traveling and living expenses for the third year the sum of $881.12. The net profit to defendant is therefore the sum of $27,718.76. The terms of the contract give plaintiff one fourth of this net profit, and consequently his portion is $6,929.69. The plaintiff was paid at the rate of $200 per month from September 1, 1905, to and including the month of September, 1906, making a total of $2,600 already paid, and leaving $4,329.69 as the amount still due the plaintiff.

3. All the expert accountants figured the guaranty of $2,400 as an item of expense to be charged against the business before striking a balance. The agreement provides that plaintiff shall receive one fourth of the profits, whatever that sum may be, with a guaranty of $2,400. If the profits do not amount to a sufficient sum to bring $2,400 to Lee, he nevertheless re-

ceives $2,400, because the contract so provides; and, if the profits are sufficient to make the share of plaintiff more than $2,400, he is entitled to that share, whatever it may be, without making a deduction of $2,400.

While the result of our calculations is in no way controlled by the profits and losses of the entire business done by defendant, still it is worth noting that, according to the books of defendant, there was a loss of $26,439.99 in 1904; a loss of $7,218.56 in 1905; and a gain of $100,558.86 on the entire business done by defendant in 1906. Approximately one fifth of the entire output for 1906 was sold by plaintiff. One fifth of the profits of that year is about $20,000, and one fourth of that amount is $5,000, which is a comparatively near approach to the result of our calculations in attempting to reach a conclusion as to the profits earned on the lumber sold by plaintiff.

The plaintiff is not entitled to recover the item of $634.40 on account of traveling and living expenses for the first year. He made no claim for that amount until the termination of his agency, and, in fact, paid those expenses himself on the assumption that he was "permanently located."

The findings of the lower court are modified, and plaintiff is awarded a judgment of $4,329.69.

MODIFIED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE EAKIN and MR. JUSTICE BEAN concur.