## HALLETT v. FISH.

(Circuit Court, D. Vermont. March 17, 1903.)

1. WEIGHT OF TESTIMONY—CONTRADICTORY STATEMENTS OF WITNESS—EFFECT.
   The fact that a witness, testifying that in a certain transaction he acted as agent for a bank, had stated in contradiction of this that he was acting individually, affects only the weight of his testimony, and does not disprove his agency.

2. BANK'S INSOLVENCY—AID OF THIRD PERSON—INDUCEMENT BY CASHIER—AGENCY FOR BANK—SUFFICIENCY OF EVIDENCE.
   Evidence in an action by one furnishing aid to an insolvent bank (being induced thereto by its cashier) to recover from the receiver, as a preferred creditor, considered, and held to show that the aid was furnished to the cashier in his official capacity, as representative of the bank, and not as an individual.

3. SAME—FRAUD OF CASHIER—EFFECT AS TO BANK.
   Where a cashier of an insolvent bank, acting for it, induced his financée to furnish securities for a loan to aid the institution, any fraud practiced on her through advantage taken of the relation between them was that of the bank.

4. SAME—PREFERENCE AS CREDITOR.
   A woman engaged to marry the cashier of an insolvent bank, who is told by him that the bank is in trouble and needs money or securities immediately, and is induced by him to furnish securities for a loan to the bank, but is not told that the bank's capital is gone, and more, as a result of defalcations by the cashier and others, is entitled to recover from the receiver, as a preferred creditor, the amount of the loan paid by her to save her securities.

In Equity.

H. Henry Powers, for plaintiff.

Frank L. Fish and Ebenezer J. Ormsbee, for defendant.

WHEELER, District Judge. D. Henry Lewis was a director and the cashier of this bank, which, partly through his mismanagement, had become insolvent and embarrassed, and this condition became known to the other officers, and an examination was being had April 9, 1901. The shortage was then supposed by them to be about $35,000. The plaintiff was engaged to marry Lewis, was temporarily at Vergennes, and had stocks and bonds in a savings bank at Concord, N. H. The shortage was principally at the National Bank of Redemption at Boston. A director provided $10,000. Lewis applied to the plaintiff for $25,000. She hesitated, but soon consented to furnish securities for that amount, to be pledged at the Bank of Redemption. She got them from the savings bank, took them to Boston, and let Lewis take them to the Bank of Redemption, where a note of Lewis to that bank for $25,000 was prepared, with a consent by her that he might pledge her securities for payment of the note, which she went and signed on April 11th, and the amount of the note was credited to the Farmers' Bank. The shortage of the Farmers' Bank was found to be, by greater misapplications of Lewis than were supposed, and those of others, much larger than was expected, showing it to be hopelessly insolvent; and it was closed by the Comptroller of the Currency and put into liquidation on the 13th. The plaintiff paid the note of Lewis to the Bank of Redemption to save her securities, and

has brought this suit to have the amount so paid decreed to her out of the assets. The defense is that the plaintiff dealt with Lewis solely, and has no just claim, or none but that of a common creditor, against the assets of the bank.

The plaintiff's securities have swelled the assets of the bank to the extent of $25,000, without any advantage to her or loss to the bank; still, if she aided Lewis solely, and he the bank, she must look to him for her property, and the bank was held only to him, however disastrous that may be to her interests. This makes it necessary to see carefully how and on what inducements she parted with her securities. No one saw her about making the arrangement but Lewis, and no one else about carrying it out, but the cashier of the Bank of Redemption; and what it was is to be ascertained from their testimony, and the circumstances shown by the testimony of others. Her testimony is consistent throughout, and does not differ materially from Lewis' as to the facts. That he has stated differently and stated that the securities were furnished to him, and by him to the bank, does not prove that the facts were as he is shown to have stated, but only affects the weight of his testimony in comparison between theirs as to the facts, and the evidence, if any, the other way. Their testimony is that he told her the bank was in trouble and must have immediate help, and there is no testimony that he told her that he was in distress and needed help, or that he was interested in procuring help, otherwise than through the bank. His testimony, although impeached by these contrary statements, for what value is left to it, corroborates hers, and there is nothing but the form of the papers taken by the Bank of Redemption to qualify hers. The paper required of her by that cashier was this:

"Boston, April 11, 1901.

"E. A. Presbrey, Esq., Cashier National Bank of Redemption, Boston, Mass. —Dear Sir: Whereas, D. H. Lewis of Vergennes, Vermont, has given me stocks and securities satisfactory to me in exchange for the following described stocks and bonds, to wit:

"3,000 Bangor & Aroostock 5's, due January 1943, Nos. 398, 399, and 400, July, 1901, coupons attached.

"2,000 U. S. coupon 4's, due 1925, May 1901, coupons attached.

"2,000 Central R. R. Co. of New Jersey 5's, due July 1st, 1987, Nos. 2,154 and 34,781, July, 1901, coupons attached.

"1,000 Indianapolis Water Co., 5's, payable July 1st, 1926, No. 280, July, 1901, coupons attached.

"1,000 Iowa Loan & Trust Co., Des Moines, Debenture 5's, Series 11, No. 96, July, 1909; coupons attached; also the following stocks standing in my name:

"10 shares Northern R. R. Co., Ctf. No. 24,110.

"30 " Concord & Montreal R. R., Class 3, Ctf. No. 1,325.

"55 " Pennsylvania R. R. Co., Ctf. No. 563,247 for five shares and No. 519,404 for fifty shares.

"10 " Quincy R. R. Bridge Co., Ctf. No. 2,949.

"10 " C., B. & Q. R. R. Co. Ctf. No. A64,048.

"I hereby authorize the said Lewis to pledge all of the above-named securities as collateral to his note given this day to the National Bank of Redemption for the sum of $25,000, dated April 11th, 1901, payable on demand after thirty days' notice.    Frances Pearson Hallett."

The plan for using her securities was made, Lewis' note was executed, and this was prepared for her to sign after Lewis had taken

her securities to the Bank of Redemption, and before she came; and, while it shows that she was dealing with Lewis, it does not show but that she was dealing with the Farmers' Bank through him, and authorizing the pledge of her securities for the benefit of that bank by him. The cashier testifies that Lewis' note was of no importance in the transaction, and that it was discounted for the purpose only of having the proceeds go to the credit of the Farmers' Bank. This all shows that the loan of the securities was made to Lewis as cashier (which was the office she understood he held) of the Farmers' Bank, and that it was induced by regard for Lewis, because help to the bank in its trouble would, as understood by her, be a favor to him. And she was not informed of the true situation of the bank, nor of its condition as the officers understood it, and she could not act on an equality with them. She was told that the bank was in trouble and needed money or securities immediately, but this did not mean to her what it would to experienced bankmen or trained financiers. She was not told that the capital was gone, and more, nor that the disaster was the result of defalcation and crime, which might reach much further. And she was peculiarly exposed to deception by her engagement to Lewis. But for that, she would not have been applied to for the loan, nor have complied. In Gilmore v. Burch, 7 Or. 374, 33 Am. Rep. 710, the court says:

"The influence of a man over a woman to whom he is engaged to be married is presumed to be so great that in transactions between them the court will look with great vigilance at the circumstances and situation of the parties, and will not only consider the influence which the intended husband, either by soothing or violence, may have used, but require satisfactory evidence that it has not been used."

And Kerr on Injunctions, at page 47, says:

"The principle applies equally to the case of third persons who make themselves parties to transactions between persons filling a fiduciary position, and those towards whom they stand in such relation, or who take securities with notice that they have been obtained by a person filling a position of a fiduciary character, from a person towards whom he stood in such relation."

These are not new doctrines or principles in respect to dealings between those standing in confidential or overpowering relations to one another. They are as old as jurisprudence, as universal as equity, and as salutary now as ever.

Whatever advantage Lewis took of his relation to the plaintiff, the bank assumed in adopting his transaction. If the bank had used its assets to secure importunate creditors, or taken the money of depositors at the time and under the circumstances of taking the plaintiff's securities, without disclosing more than was made known to her, the assets taken out would have to be returned, to make all equal, and the deposits would not be drawn into the general wreck. It could no more bring assets of others, without full and fair disclosure, into, than it could save others already in from, the impending disaster, to shift the burden of losses. Roberts v. Hill (C. C.) 24 Fed. 571; Wasson v. Hawkins (C. C.) 59 Fed. 233; 3 Am. & Eng. Encycl. of Law, "Banks and Banking," V (2d Ed.) 847. There was no inducement of others to act differently from what they would by what she did. It is a question of making her stand losses of oth-

·ers, already fixed, for nothing. It does not seem lawful or just that she should.

Decree for plaintiff for $25,000 of the assets.