Argued June 19, modified September 10, 1918.

## SCHLUSSEL v. HAYS.

(174 Pac. 722.)

**Specific Performance—Parol Agreement—Interest in Land.**

1. In order that a parol agreement, creating an interest in real property, may be enforced, it must be clear, definite, just, reasonable and mutual in all its parts.

[As to certainty in contract as requisite for specific performance, see note in 26 Am. Dec. 661. As to mutuality of contract as requisite for specific performance, see note in 7 Am. Dec. 492.]

**Specific Performance—Confidential Relationship of Parties—Presumption of Invalidity.**

2. Where plaintiff assisted sixty-nine year old widow in the management of her property, secured tenants, collected rents and advised her in business matters, the relationship was confidential, and latter's parol agreement to convey land to former in suit for specific performance is presumed to be invalid.

**Specific Performance—Degree of Proof—Presumption of Invalidity.**

3. In action for specific performance of parol agreement to convey land, where plaintiff had for many years assisted promisor in the management of her property and advised her concerning her business affairs, the presumption of invalidity of the agreement raised by confidential relationship of the parties can be overcome only by clear proof of good faith of former and full knowledge and independent consent of latter.

**Principal and Agent—Principal's Agreement to Convey to Agent—Independent Advice of Third Person.**

4. Independent advice of a third person is not essential to support principal's agreement to convey land to his agent for a fair consideration.

**Specific Performance—Sufficiency of Evidence—Parol Agreement to Convey.**

5. In action for specific performance of parol agreement to convey bungalow, evidence *held* to show that owner agreed to convey bunga-

low to plaintiffs in consideration of their being married and boarding and caring for her the remainder of her life.

**Descent and Distribution—Liability of Heir for Ancestor's Debt.**

6. In action for specific performance of agreement to convey bungalow, brought after promisor's death, plaintiffs cannot recover judgment for unpaid installments on bungalow against promisor's heir under Section 491, L. O. L., making heir liable for ancestor's debts to extent of real estate inherited, where it does not appear that personal assets of the estate were insufficient to pay such debt under Section 492.

From Multnomah: JOHN P. KAVANAUGH, Judge.

Department 1.

This is a suit for the specific performance of an oral agreement to convey land. Josephine Leach had conducted a rooming and boarding house on Park Street in Portland for about six years prior to making the agreement sued upon; and Mark Schlussel, to whom she was affianced, had been one of her roomers and boarders for more than five years. Josephine Leach did not own the building in which she conducted her business but she did own and had paid about $4,000 for the furnishings used in the house. Mrs. Margarette Butrick was a widow, aged about 69 years, and had lived for about three or four months in rented rooms, which she had furnished, in a house on Lownsdale Street in Portland. Edward Hays is a son and the sole heir of Margarette Butrick. On the 8th or 9th of January, 1915, Mrs. Butrick moved from the rooms which she had been occupying on Lownsdale Street to the rooming-house conducted by Josephine Leach.

In 1910 the owner of Lot 6 in Block 38 in Rose City Park agreed to sell that property to William F. Gwin and wife for $4,000 to be paid in specified monthly installments. The contracting purchasers were entitled to possession of the premises so long as they paid the installments when due. On December 17, 1914, the

Gwins, who up to that time had paid the monthly installments as they matured, assigned their contract to Mrs. Butrick. A bungalow stood upon the lot and for that reason the property is frequently referred to in the record as the bungalow. Mrs. Butrick owned considerable property and Mark Schlussel had assisted in managing her property for about twelve years by securing tenants, arranging for leases, collecting rents and advising her concerning her business affairs. On January 15, 1915, Mrs. Butrick moved from Josephine Leach's boarding-house to the bungalow and continued to reside there until the date of her death, which occurred on July 20, 1915.

Josephine Leach and Mark Schlussel were married on January 30, 1915, and on the same day they moved into the bungalow where they are still residing. The Schlussels boarded and cared for Mrs. Butrick from the date of their marriage until the time of her death.

Claiming to be the owner of the bungalow as the sole heir at law of Mrs. Butrick, Edward Hays began an action in ejectment against the Schlussels to oust them from the premises; and the Schlussels then commenced this suit by filing a complaint in the nature of a cross-bill in equity.

The plaintiffs aver that Mrs. Butrick made an offer to them that if Mrs. Schlussel (then Josephine Leach)

"would give up the boarding and lodging house, sell her furniture and she and the plaintiff, Mark Schlussel, would marry and together make a home for, take care of, board and lodge the said Margarette Butrick during the remainder of her natural life in the bungalow * * she would in consideration thereof give them" the bungalow.

The complaint alleges that

"the plaintiffs, after due consideration of said offer, agreed to same in consideration thereof and as a part

89 Or.—30

of said agreement, the said plaintiff, Josephine Schlussel, disposed of all the furniture in said premises on Park Street, except what she moved into the bungalow, at a great sacrifice."

The plaintiffs also allege that possession of the bungalow was delivered to them on January 30, 1915; that they made and paid for permanent improvements, with the knowledge and consent of Mrs. Butrick, by planting shrubbery, enameling the kitchen, decorating the bedrooms, improving the woodwork and installing electric wirings.

The answer states that Mark Schlussel had for a long time acted as the agent of Mrs. Butrick in the management of her property

"and in the course of said relations said Mark Schlussel acquired great personal influence over said Margarette Butrick, and by reason thereof said Margarette Butrick had and reposed great confidence in said Mark Schlussel; that by reason of the premises there existed at the time of the making of the alleged contract set forth in the complaint, and had existed for some time prior thereto, a confidential relation; that if any promise was ever made by said Margarette Butrick to plaintiffs, as alleged in plaintiffs' complaint, it was made by her at the suggestion, persuasion and undue influence of the said Mark Schlussel to and upon her, and without first having the advice and counsel of any disinterested person, and for that reason was not a binding contract in equity."

Continuing, the answer relates that the plaintiffs complained to Margarette Butrick that the boarding-house was not paying and that they desired to discontinue the business and

"that thereupon said Margarette Butrick offered to them that in the event they intermarried and closed their said boarding and lodging house, they might live with her in her bungalow, in consideration that they

would board her and maintain said house in payment of rent''; and that ''the plaintiffs occupied said premises with said Margarette Butrick until the time of her death, upon the said understanding and agreement that they were to board said Margarette Butrick and maintain said home for her in payment of rent and not otherwise.''

The decree of the trial court was for the plaintiffs and the defendant appealed.          MODIFIED.

For appellant there was a brief over the name of *Messrs. Manning, Slater & Leonard,* with an oral argument by *Mr. Woodson T. Slater.*

For respondents there was a brief over the name of *Messrs. Bernstein & Cohen,* with an oral argument by *Mr. Alex Bernstein.*

HARRIS, J.—In brief, the contention of the plaintiffs is that Mrs. Butrick agreed to convey the bungalow to them if they would board and care for her during the remainder of her life; and that after having taken possession of and permanently improved the premises with the knowledge and consent of Margarette Butrick and after having fully performed their part of the agreement, they are entitled to a conveyance of the property in fulfillment of the agreement made by Margarette Butrick. The position of the defendant is that his mother retained possession of the bungalow and merely permitted the plaintiffs to occupy the premises with her with the understanding that they could pay rent by boarding and caring for her; that if his mother did in truth promise to convey the property to the plaintiffs such promise was induced by undue influence exercised by Mark Schlussel while occupying a confidential relation; and that, therefore, upon the death of his mother he became the owner of her interest in the bungalow.

There are two questions of fact to be decided: (1) Did Mrs. Butrick agree to convey the property to the Schlussels as alleged by them? And if she did so agree (2) was the agreement brought about as claimed by the defendant? Before attempting to ascertain the ultimate facts, attention should first be directed to certain rules which govern the parties and control the court.

1-4. In order that a parol agreement creating an interest in real property may be enforced, it "must be clear, definite, just, reasonable and mutual in all its parts": *Tucker* v. *Kirkpatrick,* 86 Or. 677, 681 (169 Pac. 117). A confidential relation subsisted between Mark Schlussel and Mrs. Butrick and therefore equity raises a presumption against the validity of the agreement sought to be enforced; and before the Schlussels can prevail they must overcome this presumption by affirmatively proving compliance with equitable requisites: 2 Pom. Eq. Jur. (3 ed.), §§ 956 and 959; *Gilmore* v. *Burch,* 7 Or. 374, 384 (33 Am. Rep. 710); *Jenkins* v. *Jenkins,* 66 Or. 12, 17 (132 Pac. 542); *Clough* v. *Dawson,* 69 Or. 52, 60 (133 Pac. 345, 138 Pac. 233); *Baber* v. *Caples,* 71 Or. 212, 225 (138 Pac. 472, Ann. Cas. 1916C, 1025). The presumption of invalidity raised by the law

"can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action": 2 Pom. Eq. Jur. (3 ed.), § 957.

When a principal conveys land to his agent

"and the principal on his side acted with full knowledge of the subject matter of the transaction and of the person with whom he was dealing, and gave a full and free consent,—if all these are affirmatively proved, the presumption is overcome, and the transaction is valid": 2 Pom. Eq. Jur. (3 ed.), § 959.

Whatever the rule may be with reference to independent advice where a *cestui que trust* makes a gift to the trustee or whatever the rule may be where the principal confers a bounty upon the agent, independent advice of a third person is not essential to support an agreement of a principal to convey land to his agent for a fair consideration: 2 Pom. Eq. Jur. (3 ed.), pp. 1758, 1759, and notes.

5. All parties concerned admit that the Schlussels and Mrs. Butrick made some sort of an agreement. The dispute relates to the terms of the agreement. The Schlussels say that the bungalow was to be conveyed to them, while the defendant contends that they were only to have the use of the bungalow during the life of his mother. In other words, since the parties concede that there was some kind of an agreement the ultimate facts are that there was an agreement and that its terms were either as claimed by the plaintiffs or as asserted by the defendant. Careful readings of the entire record have convinced us that the terms of the agreement were as alleged by the plaintiffs and that they have established their contention by evidence which in kind and quality fully meets the justly rigorous requirements of the law. No good purpose could possibly be served by giving a detailed statement and analysis of all the evidence and we shall therefore content ourselves with a mere outline of some of the outstanding circumstances which unequivocally point and lead to the ultimate fact as found by us.

There was a persuasive reason for Mrs. Butrick to make the agreement and that reason is found in the circumstance that she wanted to live with somebody. She was 69 years of age; and although there is not a word of evidence to indicate that she was mentally weak yet it does appear that because of certain physical disabilities, producing repellent rather than attract-

ive conditions, she sometimes needed to be assisted and cared for by another. She had attempted to live with her son and his wife but at the end of two or three months she left because unable to "get along" with the wife. Her attitude toward the defendant and his wife is reflected in a conversation she had with one witness while at the Park Street boarding-house and in a talk she had with another person at the bungalow.

Mrs. Katherine White was one of the roomers at the Park Street house and she said that while there Mrs. Butrick "talked of her son and her son's wife" and that "she would like to live with them, but that they didn't make it happy for her."

Another witness, Edward Cashmore, testified that while engaged in doing some painting in the bungalow Mrs. Butrick told him that

"she had given her son Edward, I think she called him, considerable money, and she could not, or did not want to live with any of her folks, and she was staying with the Schlussels."

It is true that the plaintiffs had been engaged,—for how long is not shown by the record,—and that Josephine Leach refused to consummate the engagement until Mark Schlussel demonstrated to her that he could furnish her a home, and consequently it can be plausibly argued that the desire of Mark Schlussel to redeem his plighted troth and the refusal of Josephine Leach to enter into the bonds of matrimony until he furnished her a home supplies a motive for the claim that he overreached Mrs. Butrick. This argument advanced by the defendant has not been overlooked, but it has been given due consideration.

Mrs. Butrick did not go to her son for advice concerning her affairs, but she preferred to consult with others.

During the declining days of her life she attempted to live in the home of her son but she afterward sought and found elsewhere what she had sought and failed to find in the home of her son.

The Schlussels were placed in possession of the bungalow. The plaintiffs made permanent improvements upon the premises with the knowledge and consent of Mrs. Butrick.

The witness Cashmore worked around the bungalow for three or four weeks while plaintiffs and Mrs. Butrick were living there and he testified that "from conversations I overheard just as a man working around the house will, that the property was Schlussel's and she [Mrs. Butrick] was simply staying there"; and again, when speaking of conversations overheard by him he said that he understood from them that "I was to look to Mrs. Schlussel for the money for the work I was doing around the house."

The Schlussels paid $45 for enameling the kitchen, $30 for tinting, $27.50 for electric wiring and between $40 and $55 for shrubbery.

Mrs. Butrick made statements to disinterested persons, before moving into the bungalow, indicating a desire to have the plaintiffs agree to do exactly what the Schlussels now claim they did agree to do.

Charles Kirk testified that Mrs. Butrick said to him at the Park Street boarding-house that

"she would like to have Mr. and Mrs. Schlussel get married and that she wanted to buy a home on the East Side for them if they would keep her the remainder of her life."

Mrs. Katherine White appeared as a witness and said that Mrs. Butrick told her that

"if the plaintiffs would marry she would give them the bungalow, if they kept her for the rest of her life."

The plaintiffs testified, in substance, that Mrs. Butrick made the offer to buy a home and convey it to the plaintiffs if they would care for her during the remainder of her life; that the offer was communicated to Mark Schlussel and that he in turn informed Josephine Leach of it; that the offer was not accepted immediately, but after some deliberation the plaintiffs concluded to accept the offer.

Mrs. Butrick moved to the Park Street boarding-house and disposed of all the furniture that she had in the Lownsdale Street rooms except a bedstead, which was afterward taken to the bungalow. The Schlussels furnished the bungalow throughout with furnishings that had ·been used in the Park Street house and they sold the remainder of the Park Street house furnishings at a sacrifice. Mrs. Butrick was permitted to choose her own room in the bungalow and that room was supplied with furnishings selected by her from the Park Street furnishings.

The plaintiffs were married in the County Courthouse and from there they went to the Hazelwood restaurant where a wedding feast was spread. While at the wedding feast Mrs. Butrick made statements which corroborate the version given by the plaintiffs; and those statements were not only unequivocal but were made under circumstances naturally calling for truthful expression and were made to persons whose testimony is entitled to full belief.

W. N. Gatens, a circuit judge, who performed the wedding ceremony, was present at the wedding feast and when asked to "tell us anything you recollect," testified as follows:

"Well, I cannot recall any exact words. We just talked about Mr. and Mrs. Schlussel, and about—it seemed Mrs. Schlussel before her marriage, as I recollect it, maintained a rooming-house and boarding-

house and Mr. Schlussel had lived with her and boarded with her in one of Mrs. Porter's houses, and I knew the property up there, knew Mrs. Porter, and that attracted the conversation.    And the impression I got— I would not attempt to use the language, because we were just there at a wedding feast—but the impression I got was Mrs. Butrick, that they were to give Mrs. Butrick a home during her lifetime''; and in response to the next question, "that would be the substance?" the witness continued thus: "that would be the substance of it and that when she died the home would be theirs.    That was about the substance."

W. P. La Roche, city attorney of Portland, also attended the wedding feast and when asked to "state the substance of the conversation concerning the relationship that was to be and what it was expected from one party to the other," testified as follows:

"The understanding I have had in my mind all the time was that Mrs. Butrick was to make her home with Mr. and Mrs. Schlussel and she was to give them a bungalow that had been purchased at Rose City Park. Afterward I visited them in the bungalow in question, and the matter was again referred to between Mr. and Mrs. Schlussel and Mrs. Butrick while I was there, and the same understanding was had."

From time to time after she moved into the bungalow up to the date of her death Mrs. Butrick made statements, to different persons whose testimony is entitled to belief, which support the contentions of the plaintiffs.

Michael Ruvensky visited the Schlussels at the bungalow and heard Mrs. Butrick say "she would be taken care of well, and that she had given the property to Mr. and Mrs. Schlussel if they would take care of her until her death."    The testimony of this witness is corroborated by his sister Clara Ruvensky, who was present and heard the conversation.

George Ribbecke attended a card party at the bungalow and on that occasion heard Mrs. Butrick say "this is my home as long as I live, but I made Joey a present of this home."

Charles Kirk visited at the bungalow after the Schlussels were married and was told by Mrs. Butrick that

"she was very much pleased with her home out there, and that it belonged to Mrs. Schlussel, that she gave it to her as a wedding present with the understanding that she was to live there the rest of her life and they were to take care of her."

Frank L. Waller says that on one occasion when he was visiting at the bungalow Mrs. Butrick

"told me she had given the place to Joe, as she termed Mrs. Schlussel, and she was going to live with her; that she had given the place to them."

L. M. Sullivan, who stayed at the bungalow for about 10 days in June, 1915, testified that Mrs. Butrick "told me she had made a present of it [bungalow] to Josie and Mark."

Mr. La Roche paid two visits to the Schlussels after their marriage; the first visit was "inside of a month following"; and "the next time was perhaps about six or eight months"; and he testified that

"the last visit I paid to the Schlussels Mrs. Butrick said that she was not feeling well at that time, had been indisposed, and just as soon as she felt better she wanted me to prepare some instruments and necessary papers to give the bungalow to Mrs. Schlussel."

Some of the statements attributed to Mrs. Butrick were made in the presence of both or one of the Schlussels, while others were made in their absence.

The bungalow does not embrace all the property owned by Mrs. Butrick at the time of her death. She

owned a three-story brick building, two farms and other property which with the bungalow were inventoried by the appraisers of her estate at $17,000, but Mark Schlussel claims that the "approximate value of the whole estate outside of this bungalow" at the "least figure would be $75,000."

It is true that there was evidence in behalf of the defendant. Besides the defendant himself, four witnesses, two of whom were manifestly biased against the Schlussels, gave testimony in support of the position taken by Hays. However, the evidence for the plaintiffs, as we read the record, establishes the claim made by them with the degree of certainty required by the law; and moreover as stated by Mr. Justice McCamant in *Tucker* v. *Kirkpatrick*, 86 Or. 677, 679 (169 Pac. 117),

"the lower court saw the witnesses and heard their testimony; his opportunities for determining the issue of fact arising on this conflicting testimony were better than ours and great respect is due to his findings."

As a part of the decree the trial court ordered the defendant to pay the installments as they matured and "if he refuse to do so, that the plaintiffs herein have and recover judgment of and from the said Edward Hays, defendant, for the sum of eighteen hundred ($1800) dollars with interest thereon, the amount of the installments remaining due and unpaid."

The defendant was appointed administrator of his mother's estate. The record does not show when the appointment was made but it probably occurred soon after July 20, 1915. There is no evidence to show whether the estate has been closed and the administrator discharged; but in view of the fact that this suit was begun on February 11, 1916, it may be assumed that the estate had not yet been closed when this suit was commenced. Edward Hays is the sole defendant.

The plaintiffs do not allege that the administration of the estate has been completed, nor do they aver that the personal assets of the deceased were insufficient to pay the claim of the plaintiffs nor is it shown that any attempt was made to collect from the administrator.

It is provided in Section 491, L. O. L., that heirs are liable to a suit by a creditor of a deceased person to recover the debt of their ancestor to the extent of the value of any real property inherited by them. The money judgment entered against the heir, Hays, proceeds upon the theory that the amount of the judgment represents the debt of the ancestor, Mrs. Butrick. The word "debt" is defined by Section 494, L. O. L., to

"include all claims for the payment of money, whether liquidated or otherwise, which survive against the personal representative of the deceased, as provided in Section 484, L. O. L."

But Section 492, L. O. L., declares that the heir is not liable for the debt

"unless it appear that the personal assets of the deceased were insufficient to discharge it, or that after due proceedings the creditor has been unable to collect the debt from the personal representatives of the deceased, or from his next of kin or legatees. If the personal assets were sufficient to pay a part of the debt, or in case a part thereof shall have been collected, the heirs of such deceased person are liable for the residue."

6. The personal property is in the hands of Edward Hays as administrator. The real property descended to him contemporaneously with the death of his mother, but of course subject to her debts. The debt of Mrs. Butrick is not, strictly speaking, a debt of Edward Hays although he may become liable for the amount of that debt to the extent of real property inherited by him. The contingent liability mentioned in Sec-

tion 491 does not assume the form of a real liability until the creditor shows what Section 492, L. O. L., says must appear. For aught that appears in the record there may be sufficient personal assets to pay the amount, or it may be that a claim presented to the administrator would be paid. Manifestly, the plaintiffs have not brought themselves within Section 492, L. O. L., and consequently they are not entitled to a money judgment. Mrs. Butrick agreed to convey the bungalow free of encumbrances to the Schlussels, but the most that the plaintiffs are entitled to in this suit is a decree for the interest owned by Mrs. Butrick at the time of her death. The decree will therefore be modified, but without prejudice to any rights that the plaintiffs may have on account of the unpaid installments. The plaintiffs will be allowed judgment for costs and disbursements.          MODIFIED.

BEAN, BURNETT and JOHNS, JJ., concur.