LEONA MAY GILMORE, AN INFANT, BY WILLIAM R. GILMORE, HER GUARDIAN AD LITEM, RESPONDENT, *v.* HIRAM C. BURCH, APPELLANT.

UNDUE INFLUENCE—BURDEN OF PROOF.—Where one occupies a confidential or fiduciary relation to another, as that of guardian and ward, attorney and client, or the like, where the donee or grantee is supposed to exercise an unusual or commanding influence over the grantor, courts of equity will set aside the conveyance, unless the grantee can show that the transaction was fair and without fraud or undue influence.

IDEM—MARRIAGE CONTRACT, TRANSACTIONS BETWEEN PARTIES TO.—The influence of a man over a woman to whom he is engaged to be married, is presumed to be so great, that in transactions between them the court will look with great vigilance at the circumstances and situation of the parties, and will not only consider the influence which the intended husband, either by soothing or violence, may have used, but require satisfactory evidence that it has not been used.

CURTESY ATTACHES TO EQUITABLE ESTATE.—Where by a decree in equity a deed executed before marriage of the wife's land to the husband is set aside, the original estate as between the parties is restored. The husband's right by the curtesy will not be effected by the conveyance curtesy attaches to an equitable as well as to a legal estate.

RELIEF—PRAYED FOR.—The court in a proper case will grant such relief as a party is in equity and good conscience entitled to, whether such relief has been prayed for or not.

APPEAL from Yamhill County. The facts are stated in the opinion.

*J. A. Stratton and Bonham & Ramsey,* for appellants:

Undue influence, to avoid a deed or a will, must be of such a nature as to deprive the grantor, or testator, of free agency and render his act obviously more the offspring of the will of others than his own. If it was obtained by honest means, by acts of kindness, attention and persuasion, even if there had been no consideration, it could not be set aside. There must be affirmative evidence of facts from which such influence is to be inferred. It is not sufficient to show that the party benefited had the motive and opportunity to exert such influence. There must be evidence that he did exert it. (*Rutherford* v. *Morris,* 77 Ill. 397; *Cudney* v. *Cudney,* 68 N. Y. 148.)

The testimony of medical experts as to the mental condition of a person is the weakest and most unsatisfactory

kind of evidence. (*Rutherford* v. *Morris*, 77 Ill. 397; 1 Wharton & Stelle's Medical Jurisprudence, 3 ed., secs. 293, 294, 295, 296 and 296 (a.); 1 Redfield on Wills.)

The testimony shows that the defendant paid her in cash three hundred dollars; that he released debts she owed him and paid various debts for her use and benefit, amounting in all to about one thousand four hundred dollars. Marriage is not only a valuable consideration; but it is the highest consideration known to the law. This proposition is well established. (*Bonser* v. *Miller*, 5 Or. 110.) The payment of the mortgage alone was a sufficient consideration to support the deed even against creditors. (*Miles* v. *Miles*, 6 Or. 266.)

It is an elementary principle of the law of evidence that fraud will not be presumed, and that a court of equity will not rescind or reform a deed of conveyance for fraud or mistake unless the fraud or mistake be proved beyond a reasonable doubt. (*Lewis* v. *Lewis*, 4 Or. 177; *Newsome* v. *Greenwood*, Id. 119; 2 Id. 290; 72 Pa. St. 257.) It is the duty of the court to sustain the fairness of the transaction unless the fraud be clearly proved. (*Husford* v. *Horned*, 6 Or. 362.)

It may be claimed that the execution of the deed in question should be scrutinized closely, because the relation of intended husband and wife existed between the parties. We do not admit that such a principle of law exists; but if it did, it could not be invoked here, because the agreement to marry and to make the deed were made at the same time and constitute but one agreement. This principle might possibly be invoked as to any new transaction occurring after the relation was created. If the deed was obtained by fraud, then it was voidable and the grantee is held in equity to be the trustee of the grantor, and the equitable estate would remain in her. (Hill on Trustees, 144; 1 Story's Eq. Jur., sec. 1195, 1265.)

In this country, under statutes like ours, seisin in law is sufficient to entitle a husband to curtesy. (4 Kent's Com. 29, 30; 6 Cowen, 494; 38 Me. 356; 8 Jones (N. C.), 297; 24

Miss. 261; 23 Mo. 112; 5 Ohio, St. 307; *Davis* v. *Mason*, 1 Peters, 505.)

A husband is entitled to curtesy in his wife's equitable estates and uses. (1 Bish. on Law of Married Women, sec. 505; 4 Kent's Com. 22, 30; Tyler on Coverture, 416, 417.) An "equitable seisin" is sufficient to support curtesy in an equity or a use. (1 Bish. on Law of Married Women, sec. 505.) Our statutes does not require the wife to be seised alone, but speaks of "the husband and wife being seised in her right." If the deed was fraudulent they were so seised. In that event the equitable estate never passed out of her, and, he being her trustee, his possession would be sufficiently her possession to make them both seised in her right. It is one of the primary maxims of equity jurisprudence that he "who seeks equity must do equity." Hence, when courts of equity rescind deeds of conveyance for fraud or mistake, they always do so on condition that the grantor, or his or her successor or heir, will refund to the grantee the consideration paid for the deed, that the parties may be placed in *statu quo*. (Kerr on Fraud and Mistake, 343–6; *Harding* v. *Handy*, 11 Wheat. 103; 13 How. (U. S.) 230; 23 Ill. 456; 10 Ohio, 143; 1 Freeman, Ch. 35; 4 Ohio, 232; Williard's Eq. 303.) The right of the grantee to show the true consideration for the making of the deed, especially where fraud is charged, is well settled by modern decisions. (6 Wend. 360; 38 N. Y. 263; 23 Cal. 472.)

It is not necessary that the answer should pray for any kind of relief, because, if the allegations of the complaint are not sustained by proof, the court will dismiss the same, and if the deed should be set aside the court would grant the defendant whatever relief he is entitled to in equity and good conscience. (4 Or. 1; 6 Id. 284; Civ. Code, secs. 241, 339.)

*Knight & Lord, and Lawson & Sehlbrede,* for respondent:

The principle upon which courts of equity have set aside instruments executed between persons occupying fiduciary and confidential relations, has been extended and applied

" to all the variety of relations in which dominion may be exercised by one person over another." A court of equity subjects to the closest scrutiny all transactions between persons occupying any relation of confidence or trust, and if it discover any unconscionable advantage taken, or any undue influence exercised, or the least fraud practiced, it will interpose and grant relief.

In some cases undue influence will be presumed from the nature of the transaction, in others from the situation of the parties themselves. In all cases the burden of proof rests upon the party receiving the benefit, to show that the transaction was fair and honest. (*Huguenin* v. *Baseley*, 14 Ves. 273, and notes cited in 3 Leading Cases in Eq. 111, 112, 116, 122; 1 Barb. 408; 6 N. Y. 268; 31 Barb. 9.)

"The influence of a man over a woman to whom he is engaged to be married is presumed to be so great, that the court will look with great vigilance at the circumstances and situation of the parties, and will not only consider the influence which the intended husband may have used, but require satisfactory evidence that it has not been used. (11 Beav. 227; 20 Id. 524; cited in 3 Leading Cases in Eq. 120.)

In their notes to *Hugenin* v. *Baseley*, 3 Leading Cases in Eq. 139, the editors, after citing numerous authorities, say: "It may, therefore, be laid down as a general principle, that inadequacy of consideration, the presence of hard and disadvantageous stipulations, or the mere fact, that a right or advantage has been given or conceded without an equivalent will be a sufficient warrant for the interference of equity; when the weakness of the complaint, or the position held by the respondent make it the duty of the one to take that care of the other, which the latter is unable to take care of himself, although there may be no proof of actual fraud or of the exercise of undue influence." This principle has been adopted in this country. (16 Mass. 348; 13 Ill. 242; 1 Ohio State, 54; 3 Cow. 537; 10 Mo. 325.)

This court will not disturb the findings of fact by the court below any more than it would the verdict of a jury upon a mere difference of opinion as to the weight of the testimony. (12 Ohio, 75; 1 Ohio State, 54.)

The court below, by its decree, set aside the deed made by the respondent's mother to the appellant, and further decreed curtesy to him in the land. The court misapprehending the decision of Chief Justice Kent, in *Sands* v. *Codwise*, 4 Johns. 598, supposed that the deed from the respondent's mother to the appellant conveyed to him no estate whatever in the land, that it was void *ab initio*. And, therefore, the respondent's mother at the time of her marriage and during her coverture was seised of an estate of inheritance.

In the case of *Sands* v. *Codwise*, the conveyance was made to defraud creditors, and the chief justice very properly held, under the statutes of Elizabeth, the deed void as to them. There is no analogy between that case and this. There is a difference between a deed made to defraud creditors and a deed obtained by fraud practiced on the grantor. In the first case, the grantor and grantee are *in pari delicto*, and the grantee will hold as against the grantor; but in the last case, the grantor is an innocent party, and may avoid the deed as against the grantee. (2 Pick. 194.) The deed made by the respondent's mother was voidable only and not void, and she was, therefore, at no time during coverture, seised of an estate of inheritance in the lands conveyed by that deed. (*Somers* v. *Brewer*, 2 Pick. 183, and cases cited.)

There is no such thing as curtesy in an equitable estate at common law. Courts of equity, it is true, allowed curtesy of trusts and of other interests, which, although mere rights in law, were deemed estates in equity. But of these estates, courts of equity never allowed curtesy, unless the wife, during coverture, had the use and benefit of them, that is, enjoyed their rents and profits. (1 Wash. on Real Property, 130; 1 Pet. 508.)

In this case, the respondent's mother had not even a bare right in law to the land; her right was in equity, and she never enjoyed during coverture the rents and profits of the land. "Where a husband, solvent at the time, owing no debts, conveys all his real estate to his wife, the conveyance, though void in law, is valid in equity, and on the death of the wife the husband is not entitled to an estate by the curtesy, but the land descends direct to the heirs of the wife, free from

the lien of any debts contracted by the husband subsequent to the conveyance." In this state there is no dower in equity. (2 Or. 29; 5 Id. 113.

By the Court, BOISE, J.:

This is a suit in equity brought by the respondent to have annulled a deed made by her mother, Mary A. Monroe, to the appellant on the twenty-third day of January, 1877, for a tract of land in Yamhill county, for alleged fraud and undue influence in obtaining it.

The amended complaint alleges, in substance, that on the twenty-third day of January, Mary A. Monroe, the mother of the plaintiff, was seised as owner in fee-simple of the lands described; that on said date, and for a long time prior thereto, she was very infirm and diseased in mind and body, and was wholly incapable and unfit to properly manage her own business; that at said date her mental and physical condition was such as rendered her unable to guard herself against the imposition, or to resist the importunity or undue influence of the defendant; that the defendant, taking advantage of the mental weakness of the plaintiff's mother, and of her physical infirmities, and with the intention of procuring from her a deed to said lands, sought and obtained the affections of the plaintiff's mother, and engaged himself in marriage with her; that the defendant thereafter seduced her and got her with child; that during their engagement, and prior to their marriage, the defendant frequently importuned her to make him a deed to said lands, and refused to marry her until she did so; that the plaintiff's mother, unable further to resist the demands of the defendant without exposure of her condition, yielded to the solicitations and importunities of the defendant, and made him a deed to said lands on the twenty-third day of January, 1877; that the defendant procured said deed from her by undue influence and without any consideration whatever; that the plaintiff's mother and the defendant intermarried with each other on the twenty-fourth day of January, 1877, one day after the making of the deed; that the mother of the plaintiff died in August, 1877, intestate; that

the plaintiff is her only child and heir; that the defendant has had the possession of said premises ever since January, 23, 1877, etc.

The answer denies the allegations of mental unsoundness, bodily infirmity, undue influence, importunity, imposition, seduction, want of consideration, etc. It then alleges, in substance, that the defendant and Mary A. Monroe entered into an agreement, whereby the defendant promised to pay off her indebtedness, release a debt which she owed him, pay her three hundred dollars in cash, and intermarry with her; and, in consideration thereof, she promised to intermarry with him, and deed him the land in controversy in this suit. That in accordance with said agreement, said Mary A. Monroe did on the twenty-third day of January, 1877, deed said lands to the defendant, and on the next day, in accordance with said agreement, they were duly married, and that the defendant, in accordance with said agreement, paid her the said three hundred dollars, released what she owed him, and paid her debts, amounting in all to one thousand four hundred and twelve dollars and ninety-four cents, and that the defendant complied in all respects with the conditions of said agreement on his part; that Mary A. Monroe was, at the time of the making of said agreement and the execution of said deed, of sound mind, and fully capable of comprehending all her said acts and the effect thereof; that said agreement and said deed were executed by her of her own free will, and without any fraud or undue influence; that said deed purports to have been executed for the consideration of three thousand five hundred dollars, but that the true consideration therefor was the agreement aforesaid; that at the time of the execution of said deed there was a mortgage on said land for five hundred dollars and interest; and that said deed expressly provides that the grantee should pay and satisfy said mortgage; that he did accordingly pay the same, amounting to five hundred and fifty-three dollars and sixty cents, gold coin; that the defendant is the owner in fee-simple of said lands, etc.

The reply substantially denies all of the allegation of the answer.

The court tried the cause and rendered a decree setting aside the deed, etc. From this decree the defendant appeals.

It is claimed by the respondent that Mary A. Monroe, the mother of respondent, was: 1. Of a weak and infirm mind at the time of the execution of the deed; 2. That the deed was obtained by undue influence.

On the first proposition the testimony is conflicting. The medical experts who are called disagree widely as to the mental condition of said Mary A. Monroe shortly before and about the time of the making of this deed. The testimony of the familiar acquaintances and intimate friends of the said Mary A. preponderates in favor of her being at that time a woman of fully average intelligence and as capable as ordinary women to manage her own affairs, and if not constrained by some undue influence, we think she was fully capable of so doing. The evidence fails to show that said Mary A. was ill-treated by the appellant or his family after the marriage. There is no instance of harsh treatment or neglect shown, nor did the said Mary A. complain of the treatment of her husband or his family, but for anything that satisfactorily appears in the evidence she seems to have died esteeming them as friends and relatives.

The second is the main question in the case. Was the appellant at the time of the execution of this deed in such relations with the said Mary A. as to give him undue influence over her; and if so, did he exert such influence in obtaining the deed from her?

As bearing on these questions, the following propositions are established by the evidence and pleadings: 1. That about the first of October, 1876, the appellant and said Mary A. had entered into a contract of marriage; 2. That the time for the consummation of that contract was agreed upon between them, and she made arrangements for the marriage, as so agreed, about the first of October, 1876; but for some reason the appellant did not offer and assent to the marriage at that time, but the contract of marriage was not abandoned by them, but continued; 3. That during

this time the appellant solicited from her a conveyance of this land. Appellant says in his testimony that about six weeks before the marriage a contract was made between himself and said Mary A. that she should deed him this land in consideration that he should pay her debts and marry her.

It also appears that as early as about the first of October, and about the first time fixed for their marriage, said Mary A. became pregnant by the appellant. This conclusively appears from the testimony showing the time of the birth of the child. Whether he had seduced her, or their illicit intercourse had been brought about by equal mutual guilt, when her pregnancy was acknowledged and known to them both, he was in a position to almost compel her to yield to his demands as to her property. The more intelligent and capable she was the more she would dread the exposure of the loss of her virtue, and be willing to make almost any sacrifice of her property to hide her shame. Exposure would not injure him so much as it would her; for though the law may hold the guilt of each party to such transactions equal, still the social fall and degradation of the woman is by far the most complete and most enduring, and the only escape for a woman under such circumstances from overwhelming misfortune is to induce her paramour to marry her. It seems that said Mary A., stimulated by her great anxiety in this matter, was assiduous in urging the appellant to redeem his promise. She seems to have followed him to his own home, and been there pressing him on that subject, when in the hearing of Holcomb he told her he would not marry her until she deeded him this land.

Under the condition in which the parties then were, the appellant had no right to demand of said Mary A. the execution of this deed as an inducement for him to fulfill his promise of marriage. To hesitate to do it was a cruel wrong on his part, for he was under the highest obligations of honor, and the dictates of humanity, to redeem his promise without delay and without reward, for no man should be allowed to go unpunished who thus dishonors a woman,

and then abandons her and his own offspring to infamy. It was the law as given to Moses, that where a man dishonored a woman she should be his wife, and he should not put her away all his days; and though our laws do not compel the marriage, the moral obligation to perform it, when incurred, is no less binding now than then. After her pregnancy became known to said appellant, his relations with said Mary A., and presumed influence over her was such that any disposition of her property to him would be legally subject to suspicion, and liable to be set aside for undue influence, unless he should show that the same was for her benefit, or accomplished with the utmost fairness, and without constraint. The law seems to be well settled that when one accepts a confidential or fiduciary relation to another, as that of guardian and ward, attorney and client, and the like, where the donee or grantee is supposed to exercise an unusual and commanding influence over the grantor, courts will set aside the conveyance, unless the grantee can show that the transaction was fair, and without fraud or undue influence. It is laid down as a rule that the influence of a man over a woman to whom he is engaged to be married, is presumed to be so great, that the court will look with great vigilance at the circumstances and situation of the parties, and will not only consider the influence which the intended husband, either by soothing or violence, may have used, but require satisfactory evidence that it has not been used to sustain such a conveyance. (3 Leading Cas. in Eq. 119.) The case now before the court is much stronger than one where there was simply a contract of marriage when the conveyance was made, and we think this deed ought to be set aside. We will now consider the terms on which the deed ought to be canceled. It is a rule in equity that he who seeks relief in a court of equity must do equity. In order to arrive at a just conclusion as to the terms on which this conveyance should be canceled, we will have to consider the *statu quo* of the parties at the time when this conveyance was executed. If the conveyance had not been made, then on the marriage the appellant would have become a tenant by the curtesy in this land, if

he survived his wife. He would also have forgiven her what she owed him at the time, and became liable for her debts that were pressed on him during the coverture, but not for those that were not so pressed, although he had received a fortune by his wife. (Tyler on Infancy and Coverture, p. 332, sec. 334.) So that, if he had received an estate by curtesy in this land, the appellant was not liable for the debts of his wife *dum sola,* which were not demanded of him during the coverture. And if he voluntarily paid them, he could not charge them against the reversionary estate of her heir.

We will next consider the question whether appellant is, on cancellation of this deed, entitled to a tenancy by the curtesy in this land.

It is claimed by the respondent's counsel that as this deed was made at the time of the marriage, and was not void, but only voidable, the wife had no estate during her marriage with the appellant to which curtesy could attach. It is true that this deed was only voidable, but when by a decree it is canceled, the original estate as between the parties is restored, and as between them the cancellation of the deed restores the estate subject to any equities between the parties which may be determined and settled by the decree. Had the deed been absolutely void, no equities could arise out of the transaction, or attach to the land from any act of the grantee while he held the title. While this marriage existed the appellant held the legal title, and his wife was possessed of an equity in it which entitled her to the legal title, and whatever estate he had in the land was in her right, and he is entitled to curtesy in the land, and that curtesy attaches to an equitable as well as a legal estate. (1 Bishop on Law of Married Women, sec. 505.)

It is claimed that this affirmative relief can not be given to the appellant, because he has not prayed for it in his answer. We think no such prayer was necessary, for when by the complaint and the answer all the relations of the parties to this transaction are before the court in setting aside this deed, all the apparent rights of the appellant should be determined, so that he may be placed in the

same position that he would have occupied, as near as may be, had the deed not been made.

As before stated, the appellant could not by a voluntary payment, after the death of his wife, of her debts contracted *dum sola*, charge them against the inheritance which belongs to the heir. And this is the case where such debts were liens on her land in which he has an estate by the curtesy.

The case of *Warren* v. *Williams, administrator*, 10 Cush. 79, is in point as establishing this principle. In that case the deceased wife of Warren had executed her note and a mortgage on her land to secure it before the marriage. During the marriage, suit was brought against Warren and wife to collect this note, and after the death of the wife Warren suffered a judgment to be taken against him by default, which judgment he paid, and the mortgage was discharged. This was held to be a voluntary payment, and that Warren could not be substituted for the original creditor or mortgagor. In giving the opinion in that case Judge Metcalf says: "In the present case the husband, after the wife's decease, voluntarily incurred the liability to pay her debt, by submitting to a judgment against himself alone. He therefore stands on the same ground as one who pays another's debt or renders service to another without his request, express or implied. Such payment or service is a voluntary curtesy upon which no cause of action accrues. This same question was again brought before the same court in the case of *Warren* v. *Jennison et al.*, 6 Gray, 559, where it was held that such a payment gave the husband of a deceased wife no claim in equity against the heir. We have disposed of all the questions of importance in this case, and think the decree of the circuit court should be affirmed and the respondent have her costs.