Argued March 12, affirmed November 13, 1958

# *UNITED STATES NATIONAL BANK v.
## GUISS ET AL
### 331 P. 2d 865

---

* In complaint, subsequent pleadings and briefs, plaintiff-respondent erroneously described as "United States National Bank of Portland, Oregon," whereas, pleadings indicate that the bank appeared only in its representative capacity as executor of F. W. Settlemier's will.

565

*D. A. Norton,* Portland, and *Cecil H. Quesseth,* Salem, argued the cause and filed a brief for appellants.

*Irving D. Brown,* Woodburn, argued the cause and filed a brief for respondent United States National Bank of Portland, Oregon, and *Harold A. Eichsteadt,* Woodburn, and *Walter C. Winslow,* Salem, argued the cause and filed a brief for respondent Woodburn Lodge 106, et al.

Before PERRY, Chief Justice, and WARNER, MC-ALLISTER and SLOAN, Justices.

WARNER, J.

This is a suit for a declaratory judgment. It seeks a construction of three instruments relating to the title of property described as Lot 4, in Block 3, of Woodburn, Oregon. These consist of a deed dated 1912, a deed dated 1921, and a provision in the will of F. W. Settlemier, deceased.

The defendants appellant, Dell Guiss and fourteen other persons named, are the only heirs of J. H. Settlemier, deceased, and together are hereinafter called the "Heirs."

J. H. Settlemier died on February 20, 1913. His son, F. W. Settlemier, died testate on September 16, 1951. The plaintiff respondent U. S. National Bank appears as the executor of the will of F. W. Settlemier, deceased.

The defendants respondent Woodburn Lodge 106 AF&AM, Evergreen Chapter No. 41, Order of Eastern Star, Woodburn Chapter No. 29 Royal Arch Masons, and St. Elmo Commandery No. 20, Knights Templar are various Masonic unincorporated bodies or asso-

ciations which use and occupy the subject premises. They are here impleaded by making certain named individuals as representatives or officers of the respective fraternal bodies parties defendant.

Woodburn Lodge No. 106 is the body having the greatest interest in this matter. It is the organization through which the business relations concerning the subject property were in the main conducted. We will hereinafter refer to this fraternal group as the "Lodge," and when speaking of the four fraternal organizations, collectively, as the "Lodges."

It is the contention of the Lodge that it acquired fee simple title to the property under the 1912 deed by payment of the indebtedness therein stipulated.

The Heirs assert that the Lodge defaulted in the conditions of the 1912 deed and by reason thereof, the property reverted to them as the heirs of the grantor, J. H. Settlemier.

The Heirs appeal from the decree which confirms title to said premises and the whole of the building located thereon in Woodburn Lodge 106, AF&AM, subject to such interests as the three other defendant Lodges may have acquired therein by virtue of the 1921 deed.

As a logical incident to the holding made with respect to the title, the bank, as executor of F. W. Settlemier's will, was directed to render an accounting to the Lodge of all income received by it as rentals or otherwise from occupants from the date of its appointment, and after deducting charges made against the property, to surrender the balance to the Lodge. The executor does not appeal from the decree or any part thereof.

Our conclusion makes it unnecessary to give any attention to the will of F. W. Settlemier.

Before entering upon an examination of the arguments advanced by the Heirs, it is well that we first glimpse some of the history which preceded the execution of the 1912 deed, as well as after that date. All counsel engaged in this litigation have labored industriously to bring to the court's attention what is apparently every bit of evidence available to complete the complex story concerning this property from 1902 up to and including 1921. All of it is essential to an understanding sufficient to warrant the findings and conclusions which follow.

Long prior to 1912, indeed, as far back as October, 1902, the Lodge became interested in acquiring a meeting hall of its own. It appointed a committee to find a location and ascertain the cost of such project. On December 18, 1905, the Lodge minutes recite that after the committee had made its verbal report: "* * * Bro. J. H. Settlemier tendered a deed for Lot 4 in Block 3 amid much enthusiasm. Same was accepted and it was ordered that a vote of thanks be sent Bro. J. H. Settlemier * * *."

There is no record that such a deed was then or after delivered, or, if delivered, that it was ever recorded. No claim, however, is made by any of the parties concerning that deed, or promise of a deed, as the case may be. We here point to the Lodge minutes of December 18, 1905, for two reasons only: First, to establish a beginning date of the Lodge's interest in constructing a building of its own, and secondly, to record Mr. J. H. Settlemier's early association with, and deep interest in, the success of the Lodge's ambition and his own intentions in aiding in its realization.

For reasons unknown, the matter of a Lodge building was not crowded. It apparently lay dormant for four years. At least we do not hear of it again until

December 20, 1909, when the Lodge appointed another committee consisting of F. W. Settlemier, J. H. Settlemier, and J. M. Poorman, cashier of the local bank. Poorman acted as the committee's secretary-treasurer. This committee was directed "to investigate the cost of a suitable Masonic Hall building and to find out if the same could be rented for store rooms or otherwise on the first floor and also to see if the money could be obtained should the Lodge decide to build such a building * * *."

On April 18, 1910, this building committee, as shown by the Lodge minutes of that date, reported that "plans and specifications had been obtained and perfected and that further action by the Lodge was now necessary in order *to take advantage of the offer of lot for building purposes * * *.*" (Emphasis ours.)

The committee, theretofore temporary, was, on the same date, "made a permanent committee *with full power to act * * *.*" (Emphasis ours.) It embarked upon its duties with alacrity, and, so far as the record reveals, without interference or direction from the Lodge. This committee was never discharged and continued up to the Fall of 1912 to collect and apply rents in the Lodge's behalf.

The new building, a two-story brick structure with rental units for business purposes on the first floor, was completed late in 1910 and the Lodge moved into its quarters on the second floor in December of that year. The building, it was reported, had cost over $20,000. At that time (December 19, 1910), the Lodge had reason to believe that the title to the lot had been transferred to the Lodge in accordance with J. H. Settlemier's tender of deed reported in the minutes of December 19, 1905. Some support for this belief is disclosed by the fact that during the years 1910 and

1911, for the purpose of local assessments for street improvements, the property was carried on the official town rolls as owned by the Lodge, and during those years the Lodge paid street assessments aggregating $659.12.

On April 17, 1911, about four months after the Lodge moved into its new quarters, its building committee made a written report, signed by F. W. Settlemier and J. M. Poorman. This disclosed that the total cost of the new building was $23,276.49, derived from moneys which the committee had borrowed from the Bank of Woodburn on their own credit. The report commended to the Lodge's attention consideration of some plan for its orderly liquidation, adding: "* * * We think this can be done if the Lodge will be economical * * *." We have little doubt that the committee had in mind the use of building rentals for that purpose. Such is to be inferred from the nature of the committee's report filed in 1913.

The last report of the building committee available in the record in this matter, and probably the last report of its kind, was filed May 5, 1913, showing rentals collected during the year 1912, and as to one renter, the payments it made to April 1, 1913. This reveals a total income of $4,005 with disbursements for insurance, interest on the building indebtedness, taxes, and items for maintenance in the same amount. Attached to it is a financial statement showing assets valued at $29,010. This includes a value of $26,970 for the lot and building.

The next event of importance is reported in the Lodge minutes of February 19, 1912, where it is recorded that on motion a committee was appointed to draw a resolution "thanking Bro. J. H. Settlemier for his most liberal donation to this Lodge of the ground

upon which this Temple now stands." The committee presented a resolution which was a glowing tribute to the senior Settlemier for his generosity, and it was unanimously adopted by the membership.

We also observe at this point that F. W. Settlemier, in 1905, when his father tendered the deed, reported in the minutes of December, 1905, was the secretary of the Lodge and continued to occupy that office in 1906 and 1907. Presumptively, he authored the Lodge minutes for those years and as part of the established duties of the secretary of Lodge 106 received and was custodian of all the Lodge records and documents. In the years 1909 to 1912, inclusive, he occupied the highest office in the Lodge, that of Worshipful Master, and was necessarily cognizant of what transpired in the Lodge Halls during those four years. That would include, among other things, the report of the building committee made in 1911, and the resolution adopted in February of 1912, lauding his father for "his most liberal donation to this Lodge of the ground upon which this Temple now stands." We think it is a fair inference that as presiding officer of the Lodge, F. W. Settlemier appointed the committee which framed that resolution. It is a circumstance not without significance. Although the titular officer of the Lodge at the time, F. W. Settlemier remained silent while his associates paid tribute to his father's generosity and suffered them to labor under the mistaken belief that the Lodge held title to the property, *when, in fact, he then held the deed by which J. H. Settlemier had conveyed this very property to him, as trustee,* on the fourteenth day of January, 1912, or about five weeks prior to the Lodge meeting in February of the same year.

Moreover, F. W. Settlemier kept his secret well.

Meanwhile, the Lodge, ignorant of the deed's true terms and its rights thereunder, continued under the false impression of its ownership. F. W. Settlemier, as will be later seen, did nothing to disturb this mistaken belief. To the contrary, by later acts, he further contributed to this false impression and adroitly resorted to devices which circumvented the Lodge and its officers from discovering the true character of its title and the extent of his father's gift. Among other things, he did not record the deed of January, 1912, until eight years thereafter.

We now come to the first of the deeds we are asked to construe. Earlier, we have alluded to it as the deed of 1912. It is the instrument from whence the Lodge derives its claim of title and upon which the defendant Heirs predicate their claim. It was executed on January 14, 1912, by J. H. Settlemier and his wife, as grantors. Their son, F. W. Settlemier, as trustee, is the grantee.

This deed, so far as pertinent, provided:

"WHEREAS, I, J. H. Settlemier, have been for some time desirous that Woodburn Lodge # 106, Ancient Free and Accepted Masons of Woodburn, Marion County, State of Oregon, should have a building of its own and have wished to convey to said lodge the hereinafter described real property, provided such lodge would construct a building thereon to be used partly at least for lodge purposes, and,

"WHEREAS, a committee known as the Masonic Building Committee have caused to be constructed on such lot hereinafter mentioned, a building at an expense of over Twenty Thousand ($20,000.00) Dollars, and such committee have constructed such building without any financial aid from such lodge, and such committee is now owing the whole sum expended by it in the construction of such building,

which funds have been borrowed by the said committee, and

"WHEREAS, it is my desire that if said Woodburn Lodge # 106 of Ancient Free and Accepted Masons, will pay or cause to be paid the whole sum expended by said committee in the construction of said building that said building and said land upon which it is constructed shall belong to such lodge whenever it is capable of taking title to the same by incorporating or by taking such other steps as will enable it to hold real property for the benefit of its members."

\* \* \* \* \*

"TO HAVE AND TO HOLD the same together with the tenements, hereditaments and appurtenances thereunto belonging in trust nevertheless for the following purposes:

"1. If Woodburn Lodge No. 106, Ancient Free and Accepted Masons of Woodburn, Marion County, Oregon, shall either as an incorporated body or otherwise pay or cause to be paid to the Masonic Committee that has had charge of the construction of the building on the lot above mentioned and entire cost of such building so as to relieve the said committee and the individuals thereof of all indebtedness on account of the same, then to convey the above described real premises to said lodge if it is then organized in such a manner so as to legally hold real property or to the master and wardens of said lodge in trust for said lodge should the said lodge not be incorporated, and it pay or cause to be paid the said indebtedness.

"2. *Should the said lodge or the members thereof within a reasonable time, the time to be fixed by the said F. W. Settlemier, and after giving to said lodge six month's notice of the time so fixed, fail to pay the cost of said building and relieve said building committee from all indebtedness on account of the cost of the construction and maintenance thereof, then in that event I empower the said F. W. Settlemier to sell said premises* and the whole thereof at public or private sale as to him

may seem best and for such prices as to him may seem best and proper and from the proceeds of said sale pay all indebtedness incurred by said building committee in the construction of said building, and in its maintenance and up-keep; and all moneys expended by said building committee and F. W. Settlemier, trustee, in the maintenance and up-keep of said building and all sums expended for taxes, assessments of every kind and nature and also insurance and a reasonable fee to said trustee or his agent or attorney should default be made in the payment of the cost of the construction as above set forth; *and the remainder if any there be, to pay to the said lodge*; but said trustee shall be under no personal responsibility or expense on account of his trust other than for gross negligence or malefeasance [sic].

"Subject to the above conditions and restrictions I hereby convey the above described real premises to the said F. W. Settlemier, his Successors and Assigns." (Emphasis ours.)

It will be observed that the deed of 1912 is clear and explicit in that: (1) the trustee is mandated to deed the property to the Lodge whenever it paid or caused to be paid the indebtedness for the building cost, thereby making it function as security to the building committee, the members of which had advanced or arranged for the advancement of the $20,000 or more; and (2) in the event that the Lodge failed to pay such cost, the trustee was directed to sell the property, liquidate the construction debt and pay the remainder, if any, to the Lodge. Thus, as was appropriately said by the trial judge: "* * * Except for the convenience of this method, substantially the same results would have been achieved by a direct conveyance to the Lodge or its Trustees, with a mortgage back * * *."

■ Not only did the grantors in the 1912 deed convey

all their right, title and interest in the property, present and future, without a provision for a reversion, but the Lodge acquired a valuable interest therein, whether or not the construction debt was fully paid and the property sold to satisfy that debt. Moreover, we find nothing in the 1912 deed which created any beneficial interest in the trustee, except for a "reasonable fee * * * should default be made in the payment of the cost of the construction." As we construe the instrument, it is clear to this court that no part of the income from the building accrued to the personal benefit of the trutsee. It was his duty, after deducting therefrom maintenance, insurance, tax and assessment charges, to apply the balance to the reduction of the unpaid construction costs. This, he apparently did, in whole or in part, because in 1921 only $10,000 remained unpaid on the original debt.

The Lodge, even though without knowledge of the provisions of the 1912 deed, was always conscious that it had some obligation to pay the cost of erecting the building where the Lodge was housed and many times made efforts to rid themselves of this debt. Beginning in 1912, the Lodge gave serious consideration to ways and means to liquidate that cost, but without coming to a successful conclusion. Inquiries made concerning details of the debt were rebuffed. This continued until 1921. Meanwhile, it was making annual payments to F. W. Settlemier, of the building committee, denominated "rent."

■ The Lodge minutes for March 16, 1914, report an interesting account of F. W. Settlemier's apparent effort to exercise his power under the deed to fix "a reasonable time" for the Lodge to pay the construction debt. The record reads:

"A communication from Bro. F. W. Settlemier,

under date of March 2, 1914 giving notice that unless certain conditions were complied with, on or before six months from the date of the notice, the Masonic Building Property would be sold, was read and ordered filed."

The current secretary of the Lodge reported at the trial that he was unable to find this written communication after an extended search.

As a corollary to the "notice" made in the March sixteenth meeting, we glean from the Lodge account of its meeting on October 5, 1914, that:

"* * * Bro. F. W. Settlemier [being present] notified the Lodge that * * * *as executor of his father's estate,* he withdrew *the donation* of the Lot upon which the building stands." (Emphasis ours.)

Of course, whether the "notice" did or did not comply with the directions of the deed of 1912, the trustee was, as trustee or as his father's executor, powerless to terminate the Lodge's interest in the property by withdrawing his father's "donation of the Lot upon which the building stands."

Even assuming that his "notice" of March, 1914, was a valid compliance with the procedure directed by the deed, the trustee did not proceed to sell the property as the deed also directed under the circumstances. Title continued in trustee until that step was accomplished.

■ It should be remembered that up to this juncture, and, indeed, until long after 1921, no member of the Lodge had knowledge of the provisions of the deed of 1912. That was a secret which F. W. Settlemier reserved unto himself. Whether by design he thus expected to oust the Lodge from any claim of ownership, or whether in ignorance of his rights in the premises,

we do not know. But whether for one reason or the other, neither his "notice" nor his declaration of withdrawal of the lot, in any way invalidated the Lodge's valuable rights under the instrument of 1912.

The actions of Settlemier during the year 1914, referred to above, did, however, mark a change in his attitude toward the property. Thenceforth, he treated with it as being its sole and absolute owner. He collected the rents without report of any kind to the Lodge. In the absence of a more exact record, it would appear from the evidence adduced at the trial, that the rentals from the Masonic Building to December 31, 1921, were between a maximum of $18,877.50 and a minimum of $13,335.50. As of the date of the 1921 deed (December 1, 1921), only $10,000 of the original building cost remained unpaid. Enjoying, as he did in 1914, the utmost faith and confidence of the Lodge, his actions evidently left in the Lodge a sense that his withdrawal of the lot was in order and as a result the title had become invested in him.

These conclusions are not strange when we turn to the testimony of the many who were members and some who were officers in the Lodge during the years in which the transactions previously referred to were had. F. W. Settlemier is pictured as a dominant, positive and authoritative personality, particularly within the Lodge Halls. He was regarded with a respect akin to a species of awe and fear. Other witnesses who were his contemporaries, describe him as one who would not discuss matters which he had no desire to discuss or respond to questions he had no desire to answer. Sometimes he would parry inquiry by walking away from his inquisitors or abruptly turn the conversation to another subject. As stated by counsel for the Heirs, "he stiff-armed inquiry from the lodges."

He was a man of some standing in the business life of the community, with considerable influence in his Masonic fraternities, and greatly respected for his integrity and knowledge in Masonic matters. In the fraternal realm, he had been eminently successful as is attested by the various offices he had occupied in the defendant Lodge, some of which he held for many years in succession. His fraternal career also included election, in 1918, to the highest Masonic office in the state, that of Grand Master. Time was, and especially up to and including 1921, when his judgment was regarded as so superior that it was followed with such complete confidence by his fellow members that no one ventured to gainsay it; no one was bold enough to inquire into the details of Lodge transactions entrusted to his administration and accomplishment. As stated by the witness Keith Powell, "it was very difficult for members * * * to decline to do anything that he [F. W. Settlemier] might ask." This attitude prevailed until sometime after the deed of 1921.

In addition to this unique place of confidence which Settlemier enjoyed in the Lodge, is another factor which must be noted. At sometime unknown, the Lodge records; that is, the minute books, treasurer's records, and such documents as the secretary would receive from time to time, disappeared. The missing minute books and documents covered the period from 1907 to 1917. The missing financial records were for the period from 1905 to 1921. The whereabouts of the secretarial records referred to were accidently discovered to be in the possession of Settlemier at his home. This was sometime after 1930. The location of the treasurer's books for that period is still unknown. After it became known that Settlemier had the minute books, the Lodge directed its then secretary, Mr. Proctor, to call

upon him and request their return. Concerning this visit at the Settlemier home, Mr. Proctor testified that Settlemier said in response that he at that time had the records, that he was taking charge of them, and "that eventually I would get them," although the Lodge had given him no authority to remove or retain what he had in his possession. They were not, however, returned to the Lodge until several months after his death in 1951.

Such were the conditions prevailing before and up to December 1, 1921, on which date F. W. Settlemier and his wife, as grantors, executed a deed conveying to the four Lodges, as grantees (represented by a trustee for each Lodge), "all of that portion of the building above the first story of the brick structure now situated upon" the subject property.

That deed, so far as pertinent to our consideration, reads:

"THIS INDENTURE WITNESSETH:—

"THAT WHEREAS, J. H. Settlemier in a certain conveyance to F. W. Settlemier, of date the 14th day of January, 1912, which said deed is recorded in Vol. 154, on page 492 of the records of deeds for Marion County, Oregon, conveyed Lot Number four (4) in Block Number Three (3) in the original town of Woodburn, according to the recorded plat thereof of record and on file in the office of the Recorder of Conveyances for Marion County, Oregon, and in said conveyance recited that the premises in said deed described, be held by the said F. W. Settlemier for the uses and purposes in said conveyance, particularly set forth.

"AND WHEREAS, said F. W. Settlemier, on or about the 2nd day of March 1914 gave notice to the persons named in said conveyance, and particularly to Woodburn Lodge No. 106, Ancient Free and Accepted Masons of their rights and privileges

under and by virtue of said conveyance and an opportunity to avail themselves of such rights and privileges:

"AND WHEREAS: The said persons named in said conveyance and particularly the said Woodburn Lodge No. 106 Ancient Free and Accepted Masons, have failed, neglected and refused to take advantage of said rights and privileges, and have so informed the said F. W. Settlemier, and have entered into and perfected other arrangements for the acquisition and the use of a portion of the building on said lands and have and do release the said F. W. Settlemier from all obligations under and by virtue of the above mentioned instrument.

"AND WHEREAS: For the purpose of carrying out such arrangements, Woodburn Lodge No. 106 Ancient Free and Accepted Masons, Woodburn Chapter No. 29 Royal Arch Masons, St. Elmo Commandary [sic] No. 20 Knights Templar, and Evergreen Chapter No. 41 Order of the Eastern Star, have each selected one of the grantees hereinafter named, to take and hold title to the property hereinafter described, and to act collectively as trustees for said organizations.

"NOW THEREFORE, THIS INDENTURE WITNESSETH: That F. W. Settlemier and Mabel Settlemier, his wife, for and in consideration of the sum of Ten Thousand Dollars ($10,000.00) to them in hand paid, the receipt whereof is hereby acknowledged, have bargained and sold, and * * *."

The Heirs treat the deed of 1921 as a valid instrument. Thus, they claim that the Lodges have thereunder taken title to the upper story of the Masonic Building. The alleged resulting trust upon which their assertion of title rests, goes only to the first story of that building.

The Heirs also describe the Lodge as a conditional beneficiary under the deed of 1912. They represent

that this condition was payment of the building indebtedness by the Lodge and that its right to the property, or any interest therein, was dependent upon that performance. They say that the Lodge did not meet this obligation and, therefore, independent of the recitals of release and renunciation of the deed of 1912, it lost all rights that it might otherwise have had under the trust deed. We do not accede to this construction of the 1912 deed. We find no occasion to discuss the theory of the Heirs as to a resulting trust arising in their favor under the instrument of 1912, because their representation of nonpayment by the Lodge is overcome by the stipulation of all the parties to the effect that the debt for the cost of the building was fully paid. Aside from the stipulation, we think the record itself warrants the conclusion that the debt was paid in full by the $10,000 tendered by the Lodges and received by the trustee on December 1, 1921, as "consideration" for that deed.

Consistent with the Heirs' premise that the 1921 deed is valid, they rest the other facet of their resulting trust proposition upon the recitals found in the "whereas" clauses of that deed. These, they argue, operate as a renunciation of the Lodge's interest in the trust deed of 1912 and complete release of the trustee of all obligations to the Lodge as a beneficiary thereunder and assert that the Lodge is estopped to impeach them. The Heirs contend that the legal effect of these recitals was to terminate the trust as to the Lodge and its interest in that part of the Masonic Building not conveyed to the four Lodges by the 1921 deed. They observe that the 1912 deed provides for no other beneficiaries to take the remaining trust title in the property, and, therefore, conclude a trust results in their favor as the heirs of the original grantor,

J. H. Settlemier. They point to ORS 41.350(3)① and argue that section renders the recitals conclusive and binding upon the Lodge.

In one respect, the Lodge and the Heirs are in complete accord, and that is as to the nature of F. W. Settlemier's interest in the title. They say in their brief, and we think correctly, that the trustee in his own right never had any interest in the trust property; that he paid no part of the consideration; that, as trustee, he could not acquire any interest therein adverse to his duties and responsibilities as trustee, except for the benefit of the trust estate; and that he was without power or authority to change or modify the terms of the trust or create a new trust as he futilely attempted to do by his last will and testament.

As plausible as may be the estoppel theory of the Heirs in the abstract, it must be tested in terms of the trust relationship existing between the grantor and grantee Lodge as of December, 1921. For the exonerating character of the recitals in the 1921 deed make it a significant fact that it was designed to secure for the trustee a substantial and valuable personal benefit.

Before proceeding to give further attention to the contentions of the Heirs, we pause here to take note of Frank's relationship to the Lodge before and at the time of the execution of the 1921 deed. He well may be said to have occupied two confidential and fiduciary positions, each imposing upon him heavy and inexorable duties in the eyes of the law.

---

① ORS 41.350: The following presumptions, and no others, are conclusive:
* * * * *
(3) The truth of the facts recited from the recital in a written instrument, between the parties thereto, their representatives or successors in interest by a subsequent title; but this rule does not apply to the recital of a consideration.

■ In the first place, he had never been officially relieved of his obligations as a member of the Lodge Building Committee, created by Lodge action in 1910. In that capacity, he was one of its financial agents, and as such, in a fiduciary and a confidential relationship to the Lodge. *Egr v. Egr*, 170 Or 1, 8, 131 P2d 198; *Allen v. Breding*, 181 Or 332, 342, 181 P2d 783; *In Re Estate of Manillus Day*, 198 Or 518, 530, 257 P2d 609. Officers acting in behalf of unincorporated benevolent and fraternal associations are deemed agents and governed by the laws of agency. *McCabe v. Goodfellow*, 133 NY 89, 30 NE 728; 7 CJS 51, Associations § 20. As a committeeman, he was such an agent, owing his Lodge, as principal, a high degree of good faith and loyalty. *Duniway v. Barton*, 193 Or 69, 78, 237 P2d 930, 3 ALR2d 1310; *Marnon v. Vaughan Motor Co., Inc.*, 184 Or 103, 168, 194 P2d 992; 3 CJS 55, Agency § 165; 2 Am Jur 203, Agency § 252.

■ The second relationship was one of express trust and confidence. It arose from the trusteeship created by the deed of 1912, wherein the members of the Lodge Building Committee, as creditors for the advancement of the building costs, were beneficiaries along with the Lodge.

■ When such confidential and trust relationships exist, the burden rests upon the dominant confidant to exercise the utmost good faith and undivided loyalty. The existence of such responsibilities upon the part of the confidant or trustee will warrant the interposition of equity to scrupulously examine every transaction and set it aside if there is an unfair advantage in favor of the person in whom the confidence is reposed. *Davis v. Hurlburt*, 194 Or 584, 593, 242 P2d 784; *Grandy v. Robinson*, 180 Or 315, 324, 175 P2d 463; 54 Am Jur 246, Trusts § 311; 3 Bogert, Trusts

and Trustees, 375, § 543; 2 Scott on Trusts (2d ed), 1193, § 170.

How did he meet the burdens of loyalty, good faith, and openhandedness between 1912 and 1921 which equity demands of a trustee? We have already alluded to some items of his conduct which depart from the traditional standards of rectitude which the law commends, but we again repeat in explanation for the ignorance of the Lodge as to its rights and its interest in the title as of 1921. The evidence stands uncontradicted that F. W. Settlemier not only dominated the thought of the Lodge during that period by reason of his strong personality and mistaken faith of the members in his integrity and unselfish interest in its welfare. It also stands unchallenged that during this interim of approximately nine years, the trustee had done about all that was possible for him to do in order to lull the Lodge into a false understanding of its true interest in the building and kept it in that state of ignorance until he attempted to capture the title to the lower part of the premises for his own uses and purposes. To this end, he kept the 1912 deed off the records for eight years; remained silent as to its true contents; secretly obtained and retained in personal possession all Lodge records which might be revealing; collected and applied all rentals accruing from the lower part of the building; made no reports to the Lodge concerning the same and rebuffed all inquiry. In *Wood v. Honeyman*, 178 Or 484, 169 P2d 131, 171 ALR 587, we declared that one of the duties of a trustee was to supply information, saying at page 557:

> "It must be obvious that since a trustee administers the estate, not for his own benefit, but for that of the beneficiary, he must render his records available for the inspection of the bene-

ficiary and supply the latter with information pertinent to the trust. * * *"

See, also, 4 Bogert, Trusts and Trustees, 238, § 961; 2 Scott on Trusts, supra, 1293, § 173.

The trustee also suffered the Lodge by various abracadabra and concealment to believe that the property his father had given to it was withdrawn in October, 1914, and that he, in some vague and nebulous way had become the owner of the entire building. Consistent with his longtime policy of concealment, he failed to tell them that the $10,000 would cancel the debt for the construction cost.

Of the original Lodge committee of five who had a part in negotiating with F. W. Settlemier in 1921, only three were alive at the time of trial. They were H. M. Austin and Keith Powell, who, in 1921 and before, was president of the Bank of Woodburn, and Thomas Sims, all members of the Lodge and all at one time Past Masters of the organization. The first two appeared as witnesses. Mr. Sims was reported as very old and feeble and unable to leave his home. Austin and Sims were also the only two surviving trustee-grantees named in the 1921 deed. Both Powell and Austin testified that they had no knowledge of the terms of the 1912 deed or its provisions or that the title to the building reposed in a trustee at the time the 1921 deed was executed. They understood that F. W. Settlemier was the owner at the time, as was apparently the common understanding within the Lodge.

"Constructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or in nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual

fraud, and for which it gives the same or similar relief as that granted in cases of real fraud. * * *" (3 Pomeroy's Equity Jurisprudence (5th Ed), 626, § 922)

At 37 CJS 211-212, Fraud § 2, we find:

"Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud."

■ Constructive fraud usually arises from a breach of duty where a relationship of trust and confidence exists, as here. *Darrow v. Robt. A. Klein & Co., Inc.*, 111 Cal App 310, 295 P 566, 568; *In re Marine Trust Co.*, 281 NYS 553, 156 Misc 297. Indeed, it is said to arise from the very conception and existence of such relationship. *Stout v. Vesely*, 228 Iowa 155, 290 NW 116. See, also, 37 CJS 213, Fraud § 2; 23 Am Jur 764, Fraud and Deceit § 14; *Gilmore v. Burch*, 7 Or 374, 383; *Legler v. Legler*, 187 Or 273, 310, 211 P2d 233.

■ We take the following statement concerning constructive fraud arising from confidential relationships from 23 Am Jur, supra, at p 764:

"Constructive fraud often exists where the parties to a transaction have a special confidential or fiduciary relation which affords the power and means to one to take undue advantage of, or exercise undue influence over, the other. A course of dealing between persons so situated is watched with extreme jealousy and solicitude; and if there is found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party. No part of the jurisdiction of the court is more useful than that which it exercises

in watching and controlling transactions between parties standing in such a relation of confidence to each other." (Citing *Gilmore v. Burch,* supra (7 Or 374).

In the recent case of *Waterbury v. Nicol,* 207 Or 595, 296 P2d 487, 298 P2d 211, the court declared, at p 606, that:

"The fundamental duty of loyalty and good faith which a trustee owes to the beneficiaries of a trust and the rigid standard of behavior required of him when he acts in his own interest in the performance of his duties are recognized by all courts, including our own."

As a corollary to that proposition, we adopted with approval the language of 3 Pomeroy's Equity Jurisprudence (5th ed), 814, § 958d, declaring that any transaction between a trustee and his beneficiary, whereby the trustee obtains a benefit is "prima facie voidable." (207 Or at 607). In *Waterbury v. Nicol,* supra (207 Or 595), we also approved the following statement which is an excerpt from the foregoing citation to Pomeroy:

"* * * It is possible for the trustee to overcome the presumption of invalidity. If the trustee can show, by unimpeachable and convincing evidence, that the beneficiary, being *sui juris,* had *full information and complete understanding of all the facts concerning the property and the transaction itself,* and the person with whom he was dealing, and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary *a perfectly honest and complete disclosure of all the knowledge or information concerning the property* possessed by himself, or which he might, with reasonable diligence, have possessed, and that he has obtained no undue or inequitable advantage, and especially if it appears that the beneficiary acted in the transaction upon the inde-

pendent information and advice of some intelligent third person, competent to give such advice, then the transaction will be sustained by a court of equity.

\* \* \* \* \*

"The doctrine is enforced with the utmost stringency when the transaction is in the nature of a bounty conferred upon the trustee,—a gift or benefit without full consideration. Such a transaction will not be sustained, unless the trust relation was for the time being completely suspended, and the beneficiary acted throughout upon independent advice, and upon the fullest information and knowledge." (Emphasis ours.)

In *Waterbury v. Nicol*, supra (207 Or 595), we also relied upon 2 Scott on Trusts, supra, 1599, § 216.3, which, so far as presently pertinent, reads:

"\* \* \* Even if the beneficiary is sui juris, his consent will not preclude him from holding the trustee liable unless when he gave his consent he had knowledge of all relevant facts that the trustee knew or should have known and of his legal rights. Even if he does have such knowledge, he is not precluded if his consent was induced by improper conduct of the trustee. \* \* \* The relation between the trustee and beneficiary being a fiduciary relation, the trustee must not in any way take advantage of his position. The parties are not dealing at arm's length and the trustee is bound to consider not only his own interest but that of the beneficiary as well."

Also see 3 Scott on Trusts (2d ed) 2514, § 343; 54 Am Jur 240, 247, 250, 252, Trusts §§ 304, 313, 315, 318; 90 CJS 274-277, Trusts § 250; 3 Bogert, Trusts and Trustees, 161, § 493, and where the author adds: "Putting it in another way, the presumption of its fraudulent character is irrebuttable." See 2 Perry, Trusts

and Trustees (7th ed), 1452, § 850, where we find this comment: ,

> "* * * nor can any acquiescence be inferred until the *cestui que trust* has actual knowledge of the breach, for the reason that it is the duty of the trustee to execute the trust, and it is not the duty of the *cestui que trust* to make any inquiries. * * *"

What was the precise situation of the parties as of the date of executing the deed of 1921? The representatives of the Lodge were in utter ignorance of the deed of 1912 and its provisions; they had for nearly seven years labored under the belief that F. W. Settlemier was the owner of the building and entitled to receive and use all of the rentals derived therefrom, all induced by the trustee's concealment and use of half-truths, including his assertion in October, 1914, that he, as his father's executor, had withdrawn his father's gift. They knew nothing about the moneys he had collected, nor the interesting fact that those collections when augmented by the $10,000 they were offering as "consideration" for the upper story of the Masonic Temple amounted to as much or more than the original construction cost of the building. This situation of payment of the building cost then entitled the Lodge under the deed of 1912 to a conveyance of a fee simple title to the entire building from F. W. Settlemier, as trustee, and not just the fractional part which they received.

It is inconceivable that if the Lodge or its representatives at the transactions and negotiations resulting in the deed of 1921, had known of these things, as was the obligation of F. W. Settlemier, as trustee, under the deed of 1912 to have informed them, they would have bartered away those valuable rights, taking half when they were entitled to the whole. They were

not dealing at arm's length. As beneficiaries under the trust, they had a right to and were depending upon the trustworthiness, honesty and candor of the trustee. This was especially true when he engaged in a transaction which would promise to result to his personal benefit. 3 Pomeroy's Equity Jurisprudence, supra, at 814.

Yet it appears at that late date that the Lodge and its members so continued to have the fullest faith and confidence in the integrity of their trustee that they negotiated with F. W. Settlemier without having the aid and advice of counsel. They were still responsive to the domination Settlemier had for so long successfully exercised over them.

We think it is a fair inference that during those negotiations F. W. Settlemier made no offer, as was his bounden duty as a trustee, to disabuse their minds or correct their erroneous impressions concerning their rights which he had so successfully conjured by what now appears to have been a studied concealment. To have at that late hour revealed to them the matters and things he had held secret for so long would have scandalized the Lodge and invited obloquy in his community. But that possible fear was not alone the reason for his continued silence. All that he hoped to accomplish by the deed of 1921, that is, a release from the Lodge and the confirmation of his mistaken belief of right of ownership with rents from the first story, would be lost if he had lifted the veil which had so long hidden his malefactions as trustee.

We interpolate to say that so perfectly were his secrets kept that all suspicions were allayed until shortly before his death, when members of the Lodge, in search for historical data concerning the Lodge for use in an anniversary celebration, accidentally learned

of the provisions which the trust deed of 1912 made in its behalf. Meantime, from 1921 until he died in 1951, the record discloses that F. W. Settlemier collected rentals from the first story tenants for his own use and in a very substantial sum.

The appellant heirs have failed completely to produce, as was their burden, any evidence which would exonerate the trustee by showing that in the course of the 1921 transactions with the Lodge, or before, F. W. Settlemier, as trustee, gave the lodge "a perfectly honest and complete disclosure of all the knowledge or information concerning the property possessed by himself." *Waterbury v. Nicol,* supra (207 Or at 607).

F. W. Settlemier did not meet the mandates enjoined upon trustees by ORS 128.010;[9] that is, "the faithful execution of the trust imposed upon them, according to the terms of the trust." We hold that under the circumstances here present, the deed of 1921 was void; and that the appellant Heirs can claim nothing thereunder.

We now give attention to the appellants' second and last assignment of error, wherein it is claimed that the court overruled the objection of the Heirs to the admission of evidence pertaining to the interpretation and effect of the provisions of the deeds of 1912 and 1921.

■ This is addressed to a general objection made by the Heirs at the outset of the case and continued with the court's permission as a standing objection, the merits of which were to be determined after the conclusion of the trial. The Heirs invoked it by reference from time to time during the course of the trial, but

[9] ORS 128.010: All trustees residing or transacting business in Oregon are accountable for the faithful execution of the trust imposed upon them, according to the terms of the trust.

without in any instance amplifying its wording or scope. It reads:

"It is our position that our rights are determined by the two instruments, the 1912 and 1921 deeds and all other evidence introduced by the defendant [Lodges] is incompetent, irrelevant and immaterial * * *,"

which at that time they supplemented to cover any depositions, as well as any oral evidence.

Despite its rhythm and alliteration, such a general objection, resting alone upon the phrase, "incompetent, irrelevant and immaterial" is not a favorite of the court and is sustained only when a propounded question is obviously improper. *Goldfoot v. Lofgren*, 135 Or 533, 539, 296 P 843; *Hamilton v. Kelsey*, 126 Or 26, 40, 268 P 750; *Stroh, Admr. v. Rhoads*, 188 Or 563, 567, 217 P2d 245.

■ The information garnered from the documents, records, and minutes proferred by the defendant Lodge were of definite materiality to the propositions put in issue by its counterclaim. They were highly relevant in that they possess a "rational probative value" or a "logical connection" to the ultimate facts sought to be proved. *Trook v. Sagert*, 171 Or 680, 690, 138 P2d 900 (1943).

In opposing testimony relating to the Lodge's information, or want of information, concerning the 1912 and 1921 deeds, the Heirs would have us accede to the issue as being one controlled by ORS 42.230⑨ where the trial judge is directed not to insert in the instruments what has been omitted or omit what has been inserted in the construction of the instruments, but

---

⑨ ORS 42.230: In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all.

to apply, if possible, a construction giving effect to all particulars in the instrument. This case cannot be so channeled as to confine the court solely to an examination of the 1912 and 1921 deeds. But there is a more cogent objection to appellants' argument. They fail to note the construction guide found in ORS 42.-220.[4] This permits the judge to consider circumstances under which the instrument was executed and the relative situations of the parties. *Barmeier v. Oregon Physicians' Service*, 194 Or 659, 672, 243 P2d 1053.

The Lodge's offer of the Lodge books from whence we have quoted, qualifies as business records under ORS 41.690 and as "best evidence" under ORS 41.640. The minutes and records of the Masonic Lodge are ancient documents and self-authenticating. ORS 41.-360(34). *Howard v. Russell*, 75 Tex 171, 12 SW 525; 32 CJS 664, Evidence § 746(2).

The admittance of the evidence introduced by the Lodge violated no exclusionary rule. It was properly admitted and considered by the trial judge. The assignment is not well taken.

The decree is affirmed. All parties to pay their own costs.

---

[4] ORS 42.220: In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language he is interpreting.